PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

ANDRE J. HORNSBY,

       *Defendant-Appellant.*

No. 08-5267

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:06-cr-00376-PJM-1)

Argued: October 28, 2011

Decided: January 25, 2012

Before GREGORY, SHEDD, and DAVIS, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Shedd and Judge Davis joined.

## COUNSEL

**ARGUED**: Robert Charles Bonsib, MARCUS & BONSIB, Greenbelt, Maryland, for Appellant. Stuart A. Berman, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Megan E. Green,

MARCUS & BONSIB, Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Michael R. Pauze, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

After a four-year federal criminal investigation into corruption within Maryland's Prince George's County Public Schools ("PGCS"), its chief executive officer, Andre J. Hornsby, was convicted of several counts of honest-services fraud, tampering with evidence, and obstruction of justice. At the heart of these convictions is Hornsby's involvement in securing two public contracts for school products and services. On appeal, Hornsby raises a number of claims of error.[1] For the following reasons, we reverse the convictions of honest-services fraud and affirm the convictions of tampering with evidence and obstruction of justice. We vacate the sentences and remand the case for re-sentencing on the tampering and obstruction convictions.

I.

A.

This case arises from Hornsby's involvement in the consummation of two public contracts for school supplies and school-related services, only one of which is at issue on appeal.[2]

---

[1]Because we reverse the honest-services fraud convictions based on the district court's erroneous jury instruction, we need not consider Hornsby's alternative basis for their reversal: that the district court erred when it barred the admission of certain portions of Hornsby's statements that he argues are relevant to whether he engaged in a scheme to defraud. Appellant Br. at 20-37.

[2]The second contract involved PGCS hiring a company, E-Rate Managers, to provide technical services to complete the public school system's

Under this contract, PGCS purchased educational supplies and technology from the company LeapFrog SchoolHouse.

(1)   The LeapFrog Contract

In May 2004, Hornsby suggested that PGCS establish a summer program for kindergarten students and use LeapFrog products for the program. PGCS's instructional technology chief contacted LeapFrog's Maryland sales representative, Debora Adam, and requested a proposal for the summer program. Adam sent PGCS a written proposal for LeapFrog products worth approximately $67,994. PGCS did not act on the proposal.

On June 2, 2004, Hornsby held an executive council meeting to discuss using one million dollars of unspent funds toward purchasing LeapFrog products for the school district. The estimated cost of installing LeapFrog products in 216 classrooms was $938,746.80. Wesley Watts, the chief information officer for PGCS, forwarded the estimate to Hornsby and told Hornsby that he preferred to have Eugene Thornton, the director of purchasing for PGCS, speak with LeapFrog regarding the purchase. Hornsby e-mailed Watts indicating that he could get the same result for far less money.

The following day, Hornsby met with his then-girlfriend Sienna Owens, who was a LeapFrog sales representative, and discussed PGCS's interest in purchasing LeapFrog products. Although Owens's sales territory was exclusively in the state of Virginia, she agreed to inquire about the purchase of the

application process for the E-Rate program. The E-Rate program is a federally subsidized program that provides discounts to schools on their telecommunications, internet access, and computer networking. The Government presented evidence that Hornsby owned E-Rate Managers and expected to receive part of the profit made from the E-Rate contract. Hornsby was not convicted on any count supported by allegations arising from this contract.

LeapFrog products for PGCS's 216 classrooms for a cost of around $500,000. On June 8, Owens e-mailed Hornsby with a proposal of the costs for the products. In turn, Hornsby provided Thornton with the substance of Owens's e-mails but deleted all references to Owens.

The next day, Owens e-mailed Bill Davis, LeapFrog's director of sales for the northeast region, a final copy of the PGCS proposal. Because Adam was the Maryland sales representative and typically would receive the commission for the PGCS sale, Owens asked Davis for Adam's most recent total in sales so that she could compute a commission share structure between herself and Adam. On June 10, 2004, Owens e-mailed Hornsby, requesting that he call Davis to discuss the purchase order. That same day, Hornsby spoke with Davis and agreed to the purchase order; he further told Davis that Owens had done a good job in positioning and selling Leap-Frog products to PGCS. Later, PGCS issued a purchase order to LeapFrog and paid the company $956,280 for the products.

During this time, Adam and Owens agreed to split the commission from the PGCS contract. Owens's share of the commission amounted to $20,000. Having received her share, Owens testified that she gave Hornsby $10,000 "[a]s a thank you for helping me with this deal and for helping me. It was the first time I had received a significant commission in connection with the help that he had given me, so it was a thank you gesture." J.A. 1691.

(2)   The Federal Investigation

On October 14, 2004, *The Baltimore Sun* published an article that questioned Hornsby's and Owens's relationship and their involvement with the LeapFrog contract. Shortly after the newspaper probe, Hornsby instructed Watts to destroy any back-up tapes of his PGCS e-mails. Following this instruction, the PGCS e-mail specialists began to erase these tapes; however, one specialist saved certain tapes containing Horns-

by's e-mails and turned them over to the FBI after government agents executed a search warrant at the school system.

A day after *The Baltimore Sun* article, the FBI and the U.S. Attorney's Office initiated an investigation into the LeapFrog contract. As part of its investigation, the FBI instructed Cynthia Joffrion, an employee of Hornsby's private consulting business, to inform Hornsby that her husband received a subpoena for Hornsby's computer files that were in her possession. On February 7, 2005, Joffrion informed Hornsby of the subpoena and that she possessed his computer containing information regarding the contract. Hornsby instructed Joffrion to "get [the computer] out of there totally." Supp. J.A. 471.

This was not the first occasion that Hornsby instructed Joffrion to conceal evidence during a criminal investigation. Four years earlier, Hornsby was the subject of a New York state criminal investigation into his conduct as superintendent of the Yonkers Public Schools in Westchester County, New York, and an alleged theft of school computers. During this investigation, Hornsby instructed Joffrion, then a Yonkers public school employee, to ship several school-system computers to his relatives' homes. During recorded phone conversations between Hornsby and Joffrion, Hornsby encouraged Joffrion to lie to the government about her knowledge of the theft. He also encouraged her to burn any paper that was connected with the computers.

Hornsby also contacted Owens during the LeapFrog investigation. On one occasion, Hornsby sent his daughter to travel to Miami, Florida, to meet with Owens and instruct her to "stick to the story." His daughter also gave Owens a prepaid phone to use to communicate with Hornsby. Before Owens was set to testify before the grand jury, Hornsby called Owens and told her not to cooperate with the investigation against him. The following day, Owens testified before the grand jury, which returned the first indictment against Hornsby.

(3)    PGCS Board of Education Investigation

After the release of the newspaper article, Dr. Beatrice Tignor, the chair of the Prince George's County Board of Education, called Hornsby to ask him about the LeapFrog contract and the allegations made within the article. Hornsby told Tignor that the allegations were untrue and that Owens did not have a role in the contract.

Under the belief that Owens played no role in the LeapFrog contract, Tignor wrote to the Board of Education Ethics Panel asking the Panel to examine two inquiries: (1) whether a conflict of interest existed when the school system purchased LeapFrog products given that Hornsby, as CEO, maintained a relationship with Owens who did not do business with PGCS and did not handle the PGCS LeapFrog purchase and (2) whether Hornsby was required to disclose his personal relationship with Owens to PGCS when she did not work for LeapFrog at the time his financial disclosure form was submitted.

Both inquiries were based on board policies that governed Hornsby as an employee of PGCS. PGCS Policy No. 109 governs "Conflict[s] of Interest" and prohibits employees from participating "on behalf of the school system in any matter that would, to their knowledge, have a direct financial impact, as distinguished from the public generally, on them, their spouse, domestic partner, or immediate family member, or a business entity with which they are affiliated . . . ." J.A. 2644. Another policy governed school official financial disclosures. The policy required an official to file "an annual statement with the Ethics Panel disclosing any interest or employment that would constitute a conflict of interest and require disqualification from working on behalf of the school system," and to disclose "any gifts received . . . from any person . . . having a contract with the school system, or seeking to do business with the school system." J.A. 2646.

Although Hornsby received a copy of the inquiries, he did not correct Tignor's mistaken belief that Owens had nothing to do with the LeapFrog contract. He later represented in his financial disclosure statement that he had not received any income from a person or business that was a party to an existing contract with the school system.

A month later, the panel answered both inquiries. In its opinion, there was no conflict of interest arising from the LeapFrog contract, and further, Hornsby was not legally required to disclose his personal relationship at the time of his financial disclosure statement, although he may have been required to do so under another ethical policy.

On January 12, 2005, the board hired the Huron Consulting Company to investigate any ethical violations with respect to the LeapFrog contract. As part of its investigation, Huron interviewed Hornsby with his lawyer present. Hornsby stated that he had known Owens for three years, that their current relationship was a friendship, and that she had lived with him when she was hired by LeapFrog. He denied knowing that Owens had any role in PGCS's LeapFrog contract. Hornsby stated that he had not disclosed to PGCS his relationship with Owens at the time of the LeapFrog purchase because he believed it was not required by board policy.

B.

On August 22, 2006, a grand jury returned an indictment against Hornsby for twelve counts of honest-services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 and three tampering and obstruction counts in violation of 18 U.S.C. §§ 1512(b) and 1503. The jury trial began on October 16, 2007, and after twenty-one days, the district court declared a mistrial.

On April 23, 2008, a second grand jury returned a superseding indictment charging Hornsby with eighteen counts of

honest-services fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1346, two counts of witness and evidence tampering in violation of 18 U.S.C. § 1512(b), and one count of obstruction of justice in violation of 18 U.S.C. § 1503.

The second jury trial began on June 18, 2008. At the close of the Government's case-in-chief, Hornsby moved for judgment of acquittal on all counts. The district court denied the motion. The jury returned a guilty verdict on three counts of honest-services fraud (counts 6, 7, and 10). The jury further found Hornsby guilty of two counts of witness and evidence tampering (counts 19 and 20) and one count of obstruction of justice (count 22). The jury found Hornsby not guilty on one count of honest-services fraud (count 13) and one count of witness tampering (count 21). The jury could not reach verdicts on the remaining counts. The district court sentenced Hornsby to seventy-two months' imprisonment for all convictions to be served concurrently.

## II.

Hornsby challenges his convictions for honest-services fraud, witness and evidence tampering, and obstruction of justice on several grounds. We first address whether the district court's erroneous jury instruction on honest-services fraud requires the reversal of Hornsby's convictions. We then address arguments challenging the district court's rulings with respect to the tampering and obstruction counts.

## A.

Hornsby contends that his convictions for honest-services wire fraud must be reversed. He reasons that the jury instruction, the superseding indictment, and the Government's case-in-chief put forth a conflict-of-interest theory of guilt for honest-services fraud that has been disapproved by the Supreme Court in *Skilling v. United States*, 130 S. Ct. 2896 (2010). In *Skilling*, the Supreme Court addressed the scope of

the honest-services fraud statute, 18 U.S.C. § 1346, and held that the statute was not unconstitutionally vague when properly interpreted to criminalize only "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Id.* at 2928. It reasoned, "Construing the honest-services statute to extend beyond that core meaning . . . would encounter a vagueness shoal," *id.* at 2907, and thus rejected the government's contention that § 1346 also applied to conflict-of-interest cases—cases where the employee has not disclosed a conflicting financial interest to the employer, *id.* at 2932.

In light of *Skilling*, the Government concedes that the district court erred when it instructed the jury that it could convict Hornsby for honest-services fraud based on a conflict of interest. It contends, however, that because Hornsby did not raise this exact ground as an objection to the jury instruction, we must review the instruction for plain error.

We disagree. Pursuant to Federal Rule of Criminal Procedure 30(d), Hornsby timely objected to the jury instruction and adequately raised an issue with the conflict-of-interest theory of guilt for honest-services fraud. Before the jury retired, Hornsby's counsel objected to the jury instruction and asserted that, as part of his objection, he was adopting and incorporating with specificity arguments made within his motion for judgment of acquittal.

The day before, Hornsby's counsel moved for judgment of acquittal and raised a challenge to the conflict-of-interest theory of guilt for honest-services fraud presented in the superseding indictment and the Government's case-in-chief. Hornsby's counsel asserted "that the Fifth Amendment due process [clause] prohibit[s] a defendant from being held criminally liable in circumstances where the conduct was not clearly forbidden . . . and we believe that the whole ethics thing . . . is unconstitutionally vague." J.A. 2280. Hornsby's counsel then requested that the district court either grant the

motion for judgment of acquittal or "alternatively redact those portions of the allegations relating to anything pertinent to a conflict of interest or ethics panel misrepresentations or omissions." J.A. 2281. The district court denied the motion.

Because Hornsby timely objected to the instruction and took issue with the conflict-of-interest theory of guilt by reference to his Rule 29 motion, we find his objection preserved. *United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005) ("[A] claim of instructional error may alternatively be preserved by an objection in a directed verdict motion made pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, before the jury retires.").[3] Thus, we review the jury instruction for harmless error. *Skilling*, 130 S. Ct. at 2934; *Hedgpeth v. Pulido*, 555 U.S. 57, 60-61 (2008) (per curiam) (finding harmless-error review applies to an "instructional error arising in the context of multiple theories of guilt.").

---

[3]We find unpersuasive the Government's argument that Hornsby did not adequately raise the ground for his objection to the jury instruction because his motion for judgment of acquittal was based, in part, on *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008). In *Safavian*, the D.C. Circuit reversed the defendant's convictions based on 18 U.S.C. § 1001(a)(1) because the government had not proven that the defendant had a legal duty to disclose information to his federal employer. *Id.* at 965. The court noted that to comply with the Fifth Amendment's notice requirements, § 1001(a)(1) must be read to only criminalize a failure to disclose information where the defendant had the *legal* duty to disclose and not where the defendant had an *ethical* duty to do so. *Id.* at 964-65. Here, Hornsby's counsel analogized *Safavian* to this case's vagueness challenge and argued that § 1346 was unconstitutionally vague as to whether a violation of an ethical policy, i.e., Board Policy No. 109 Conflict of Interest, constituted honest-services fraud. Hornsby's argument directly addressed the conflict-of-interest theory of guilt and the vagueness concerns there implicated. *Compare Riley*, 621 F.3d at 322 n.12 (applying plain-error review to a *Skilling* challenge where the defendant objected to the jury instructions but not on vagueness concerns and noting that "one could view [plain-error] application here as somewhat harsh."). Hornsby's reliance on this case was not misplaced.

In the instant case, the jury found Hornsby guilty of three out of the eighteen honest-services fraud counts. All three counts are based on e-mail communications from Owens to Hornsby as part of their negotiations to secure the LeapFrog contract with PGCS. Because the findings of guilt were returned on a general verdict, we cannot discern whether the jury relied on a conflict of interest in reaching its decision. *See United States v. Black*, 625 F.3d 386, 388 (7th Cir. 2010) ("[B]ecause the jury returned a general verdict on the fraud counts, we cannot be absolutely certain that it found the defendants guilty of pecuniary fraud as well as, or instead of, honest-services fraud.").[4] Therefore, we must view the jury instruction in light of the evidence presented at trial to determine whether the erroneous instruction is harmless. *United States v. Hairston*, 46 F.3d 361, 373 (4th Cir. 1995).

We begin with the language of the instruction. The instruction charged that the jury need not consider whether Hornsby received a financial benefit from a third party as part of the scheme or artifice to defraud PGCS and the Board of Education. The instruction read in part:

> When an official fails to disclose a personal interest in a matter over which that official has decision-making power, the public is deprived of its right either to disinterested decision making or to full disclosure as to the official's potential motivation behind an official act . . . While an undisclosed financial benefit from such decision making may constitute a personal interest and such a personal

---

[4]Hornsby argues that if kickback and bribes were the dominant theory used to convict him, then the jury would have found him guilty of the counts that deal directly with facts supporting Hornsby's receipt of money. A jury's "failure to reach a verdict cannot – by negative implication – yield a piece of information that helps put together the trial puzzle." *Yeager v. United States*, 129 S. Ct. 2360, 2367 (2009). Thus, "[u]nlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung jury represents." *Id.*

> interest as I've described, a financial benefit need not be demonstrated in the case. That is they need not show that the individual benefited financially from the so-called failure to render honest services.

J.A. 2330. It further charged the jury that a "public official's duty and honesty includes the duty to disclose and not conceal facts known to the official, . . . such as a *personal conflict of interest*," *id.* (emphasis added), and that "The failure to disclose information may also constitute a fraudulent representation if the defendant was under a duty to make such a disclosure," J.A. 2331. Based on this language, we cannot ignore that the conflict-of-interest theory was "interwoven" throughout the district court's honest-services fraud instruction to the jury. *United States v. Riley*, 621 F.3d 312, 324 (3d Cir. 2010).

What is more, the Government argued and presented strong evidence to support the conflict-of-interest theory throughout its case-in-chief. The evidence showed that at the time the e-mail communications were made, Hornsby did not disclose to PGCS his conversations with Owens to secure the LeapFrog contract. Indeed, Hornsby acted to conceal the conflict by deleting all references to Owens when he provided the director of purchasing with the substance of the e-mail communications. Further, during PGCS's investigation into Hornsby's involvement with the LeapFrog contract, Hornsby did not disclose his knowledge of Owens's involvement and denied that he had a direct role in the negotiations.

Additionally, in its closing argument after the district court's erroneous jury instruction, the Government stated that "one of the most important jury instructions in this case is [the] Judge['s] [ ] instruction" on the definition of a scheme or artifice to defraud. J.A. 2418. The Government continued:

> He [the Judge] told you that a public official owes citizens a duty to govern honestly, to govern impar-

tially, must disclose and not conceal important facts about the conduct of the government's affairs such as a personal conflict of interest. He told you that public officials may not deprive the public of its right either to disinterested decision-making itself or to a full disclosure as to the official's potential motivation behind an official act. You can't have a conflict of interest and you can't conceal a conflict of interest. He told you it is not necessary to prove a personal benefit or a financial benefit to the public official, that the scheme is a crime regardless of whether it succeeds or it fails.

. . .

Simply put, the defendant's crime in this case is fraudulently participating in decisions where his business partner and his girlfriend had a stake and concealing it from the board, Dr. Tignor, the ethics panel and Huron, the board's outside forensic auditors.

J.A. 2418-19.

The Government did present evidence that Hornsby received a $10,000 "gift" from Owens as a "thank you" for helping her with the LeapFrog contract. While a reasonable jury could infer from this evidence that Hornsby's scheme to defraud was all along a scheme with Owens to receive a kickback from the LeapFrog contract, we cannot say "with fair assurance" that the jury convicted Hornsby on this basis alone. *Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999).

In light of this evidence and the general verdict, we cannot conclude that the erroneous jury instruction was harmless.

Accordingly, we reverse Hornsby's convictions of honest-services fraud.[5]

## B.

Hornsby raises six independent arguments that challenge his tampering and obstruction convictions. We address each argument in turn.[6]

## (1)

Hornsby contends that the district court's decision to admit evidence regarding his past conduct violated Federal Rule of Evidence 404(b). As stated before, this evidence involved Hornsby's attempt to obstruct a New York state criminal investigation into his alleged official misconduct.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996).

Under Rule 404(b), "other crimes, wrongs, or acts" may be excluded if the evidence is admitted to prove the defendant's bad character. However, this evidence is admissible for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." *United States v. Queen*, 132 F.3d 991, 994 n.2 (4th Cir. 1997) (quoting FED. R. EVID. 404(b)). This Circuit applies a four-pronged test to determine the admissibility of prior acts under Rule 404(b). The party moving for its admission must show the evidence: (1) is relevant to an issue other than character; (2) is necessary "in the sense that it is

---

[5]We have considered Hornsby's sufficiency of the evidence challenge, and conclude that the challenge lacks merit.

[6]To the extent that these arguments challenge the honest-services fraud convictions, we need not address them due to our reversal of those convictions.

probative of an essential claim or an element of the offense"; (3) is reliable; and (4) carries probative value that does not substantially outweigh its prejudicial nature. *Id.* at 997. We also have explained that an "additional protection against the pitfalls the [R]ule protects against[,] may be provided by [ ]a limiting jury instruction . . . explaining the purpose for admitting evidence of prior acts." *Id.*

With respect to the first and second prongs, the Government presented this evidence in order to prove the element of intent. *See Queen*, 132 F.3d at 997. Prior acts that are similar in nature to the charged acts have particular probative value in showing the person's state of mind because "the prior doing of other similar acts . . . is useful as reducing the possibility that the act in question was done with innocent intent." *Queen*, 132 F.3d at 996 (quoting WIGMORE ON EVIDENCE, § 302 (Chadbourn rev. 1979) (footnote and internal quotation marks omitted). Here, the evidence underlying Hornsby's conduct with respect to the state investigation was similar to the evidence supporting the federal tampering counts. During the state investigation, Hornsby tried to persuade Joffrion to "burn" paperwork and conceal computers related to the alleged theft of Yonkers public schools' computers. Likewise, during the federal investigation, Hornsby instructed Joffrion to conceal a computer.

This evidence was also reliable. The evidence consisted of an audio recording of Hornsby's and Joffrion's communications. Hornsby argues that the audio recording was unreliable because the recording was uncorroborated and could be taken out of context. Under prong three, "[e]vidence is reliable and should be submitted to the fact finder unless it is 'so preposterous that it could not be believed by a rational and properly instructed juror.'" *Aramony*, 88 F.3d at 1378 (quoting *United States v. Bailey*, 990 F.2d 119, 123 (4th Cir. 1993)). An audio recording of Hornsby telling Joffrion to burn documents and conceal computers in the midst of a state criminal investigation is not so preposterous and unbelievable to make it unreli-

able. Further, corroborating evidence to support the prior-act evidence is not required. *United States v. Hernandez*, 975 F.2d 1035, 1040-41 (4th Cir. 1992).

Finally, the probative value of this evidence was not substantially outweighed by unfair prejudice. Again, Hornsby argues that the audio recording could be taken out of context and thus be unfairly prejudicial. The mere assertion that the recording could be taken out of context does not tip the scale in favor of the prejudice outweighing the probative value, particularly when there is no indication that the prior-act evidence would lead the jury to "irrational behavior" when considering the other evidence. *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980). Further, we disagree with Hornsby that the four-year period between his prior acts and his charged conduct renders his prior acts "tenuous and remote," and thus inadmissible, *Hernandez*, 975 F.2d at 1039 (quoting *United States v. Cole*, 491 F.2d 1276, 1279 (4th Cir. 1974)) (internal quotation marks omitted), particularly given the similarity between the prior and charged acts. Notably, the district court instructed the jury that its consideration of this evidence was confined to Hornsby's intent with respect to the tampering and obstruction counts. Thus, we find that the district court did not err in admitting this evidence.

(2)

Next, Hornsby contends that the district court erred in denying his motion for severance of the tampering and obstruction counts from the honest-services fraud counts.

We review a district court's denial of a motion for severance for abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010).

Under Federal Rule of Criminal Procedure 8(a), an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or

similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." However, a district court may sever the offenses charged if the joinder of the offenses "appears to prejudice" the party. FED. R. CRIM. P. 14(a).

Where offenses are properly joined under Rule 8(a), severance of the offenses is rare. *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005) ("It is not enough for the defendant to show that severance offers him 'a better chance of acquittal.'" (quoting *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995))). "[A] district court should grant a severance under Rule 14 *only* if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Id.* (quoting *Zafiro v. United States*, 506 U.S 534, 539 (1993)). We will not reverse a district court's denial of a motion to sever unless there is a showing of "clear prejudice." *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008).

Here, Hornsby has not shown "clear prejudice" in the joinder of these counts. These counts are all related to the same series of events—Hornsby's involvement with the LeapFrog contract and the subsequent investigations. As a result, joinder under Rule 8(a) was appropriate. *See United States v. Mir*, 525 F.3d 351, 356-57 (4th Cir. 2008) (joinder of related charges is permitted to avoid needless duplication of judicial proceedings).

(3)

Hornsby's third argument is that the district court erred when it denied his motion in limine to suppress pre-indictment statements he made to Joffrion who at that time was an undercover Government informant. Hornsby states that his counsel sent a letter to the Government dated November 9, 2004, asserting Hornsby's constitutional rights as well as his desire not to have any contact with Government agents.

He contends that the Government blatantly disregarded these rights by instructing Joffrion to speak with him and in doing so violated his Fifth, Sixth, and Fourteenth Amendment rights.

We review a district court's ruling on a motion in limine for abuse of discretion. *Malone v. Microdyne Corp.*, 26 F.3d 471, 480 (4th Cir. 1994). We review de novo the question of whether the Government violated a defendant's Fifth and Sixth Amendment rights. *United States v. Melgar*, 139 F.3d 1005, 1008 (4th Cir. 1998) *overruled on other grounds by Texas v. Cobb*, 532 U.S. 162 (2001). However, we "must take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local enforcement officers." *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

The Fifth Amendment prohibits a suspect's compelled self-incrimination during custodial interrogation without advice that the suspect has the right to remain silent and the right to the presence of an attorney. *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981). Absent custodial interrogation, there is no infringement on the suspect's Fifth Amendment rights. *Id.* at 486. The Sixth Amendment guarantees the right to counsel "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Fellers v. United States*, 540 U.S. 519, 523 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)). The Fourteenth Amendment's Due Process Clause affords individuals fundamental guarantees against state action. *See e.g.*, *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3031-36 (2010) (thoroughly discussing the Fourteenth Amendment's scope and application to state action). One such guarantee is the right to be heard through the representation of counsel before an enforceable judgment is rendered. *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932) ("The right to be heard would be, in many cases, of lit-

tle avail if it did not comprehend the right to be heard by counsel.").

   In light of these principles, we find that Hornsby's constitutional rights were not violated by his communications with Joffrion after the Government's receipt of his counsel's letter. First, the Fourteenth Amendment's Due Process Clause is a limitation on state conduct, and thus Hornsby's due process protections against the federal government are found in the Fifth Amendment. *Cf. Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976) ("If . . . defamation by a state official is actionable under the Fourteenth Amendment, it would of course follow that defamation by a federal official should likewise be actionable under the cognate Due Process Clause of the Fifth Amendment."). Turning to the Fifth Amendment, use of an undercover government agent before charges are filed does not implicate a suspect's Fifth Amendment rights because there is no potential for compulsion. *United States v. Henry*, 447 U.S. 264, 272 (1980). Here, there was no potential for compulsion because Hornsby was not subject to custodial interrogation and was speaking with Joffrion over the telephone. Supp. J.A. 470-71. Further, Hornsby's Sixth Amendment rights were not violated because there were no judicial proceedings initiated against him at the time he made the statements to Joffrion. *See Fellers*, 540 U.S. at 523. The grand jury returned the first indictment on August 22, 2006, at least one year after Hornsby's and Joffrion's communications. Thus, we conclude that the letter written by Hornsby's counsel to the Government inquiring about the investigation does not afford Hornsby constitutional protection in this context and Hornsby has not directed this Court to any case law that holds this proposition. For these reasons, we affirm the district court's denial of the motion in limine.

(4)

   Further Hornsby contends that the district court erred in not

giving a jury instruction that defined reasonable doubt.[7] A district court's refusal to give a specific jury instruction is reviewed for abuse of discretion. *United States v. Herder*, 594 F.3d 352, 359 (4th Cir. 2010). To determine whether the jury was properly instructed on the elements of the offenses, we determine "whether, taken as a whole, the instruction fairly states the controlling law." *Id.*

We find that the district court was not required to define reasonable doubt to the jury so long as the jury was instructed that the defendant's guilt must be proven beyond a reasonable doubt, *Lighty*, 616 F.3d at 380, which the district court did in this case. Not requiring such an instruction is based on this Circuit's belief that "attempting to explain the words 'beyond a reasonable doubt' is more dangerous than leaving a jury to wrestle with only the words themselves." *Id.* (quoting *United States v. Walton*, 207 F.3d 694, 698 (4th Cir. 2000) (en banc)) (internal quotation marks omitted).

(5)

Hornsby also argues that if we reverse the honest-services fraud convictions, we must also reverse the tampering and obstruction convictions. He maintains that without honest-services fraud, the jury would have been presented with an entirely different set of facts and that "it is plausible, if not likely," that the jury would not have convicted him on the tampering and obstruction counts. Although Hornsby does not cite to any case law to guide our inquiry, it appears he has presented a "prejudicial spillover" challenge to his tampering and obstruction convictions.

---

[7]Hornsby raises three additional challenges to the district court's jury charge, all of which pertain to the honest-services fraud counts and not the tampering and obstruction counts. Because of our reversal of the honest-services fraud convictions, we need not consider these additional challenges.

Under this challenge, a court must determine whether evidence admitted to support a reversed count prejudiced the remaining counts to warrant their reversal. *See United States v. Livingston*, 63 F. App'x 106, 107 (4th Cir. 2003) (finding that the defendant's remaining convictions should not be vacated because there was no prejudicial spillover from evidence supporting the dismissed counts); *Riley*, 621 F.3d at 324-25 ("Prejudicial spillover analysis requires a finding that there was a spillover of evidence from the reversed count that would have been inadmissible at a trial limited to the remaining count."); *United States v. Rooney*, 37 F.3d 487, 855 (2d Cir. 1994) ("When an appellate court reverses some but not all counts of a multicount conviction, the court must determine if prejudicial spillover from evidence introduced in support of the reversed counts requires the remaining convictions to be upset."); *United States v. Bailey*, 859 F.2d 1265, 1273 n.1 (7th Cir. 1988) (finding that reversal of mail fraud counts does not automatically require reversal of remaining convictions because the counts were properly joined, there was no basis for severance, and the evidence admitted to support the reversed counts would have been admitted even absent those counts).

In the instant case, Hornsby has not pointed this Court to any specific evidence admitted at his trial that would be inadmissible at a trial only for the tampering and obstruction counts. Nor does he explain why, absent the honest-services fraud counts, the Government would be barred from presenting the bulk of the LeapFrog evidence at a trial for the remaining counts. Under Federal Rule of Evidence 404(b), evidence of other crimes or bad acts may be admitted to prove the knowledge or intent of the person for acting in a particular manner. "[W]hen a defendant has been charged with attempted or actual obstruction of justice with respect to a given crime, evidence of the underlying crime and the defendant's part in it is admissible to show the motive for his efforts to interfere with the judicial processes." *United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988). Thus, in

*United States v. Siegel*, 536 F.3d 306, 317-18 (4th Cir. 2008),
we reversed the district court's exclusion of prior-crimes and
bad-acts evidence in an obstruction-of-justice prosecution
because we found, in part, that the evidence gave the jury a
basis for concluding that the defendant had a very strong
interest in killing a Government witness. We further deter-
mined that evidence intrinsic to the crime was admissible to
prove motive because it was necessary to complete the "story"
of why the defendant interfered with the investigation. *Id.* at
316. Similar to *Siegel*, the evidence with respect to the Leap-
Frog contract was necessary to complete the story of Horns-
by's interference with the federal investigation against him
and his intent to tamper with evidence and witnesses.

Further, the Government presented strong evidence to sup-
port the tampering and obstruction convictions: Hornsby
instructed PGCS employees to destroy his e-mail files; he
requested Joffrion not to provide the federal government with
a personal computer used by Owens; and finally, he sent a
message to Owens, through his daughter, in an attempt to per-
suade Owens not to cooperate during her grand jury testi-
mony. For these reasons, we find that there was no prejudicial
spillover of evidence supporting the honest-services fraud
counts that requires the reversal of the tampering and obstruc-
tion convictions.

(6)

Finally, Hornsby submits that he is entitled to a new sen-
tencing hearing on the tampering and obstruction convictions
because his concurrent sentences of seventy-two months
reflect his honest-services fraud convictions. We review the
reasonableness of a sentence for whether the district court
abused its discretion. *United States v. Pauley*, 511 F.3d 468,
473 (4th Cir. 2007). In doing so, we examine the sentence for
both procedural and substantive errors. *Id.* After a review of
Hornsby's sentencing record, we determine that re-sentencing
on the tampering and obstruction convictions is warranted.

In calculating the sentences, the district court used the honest-services fraud convictions as the base offense for the tampering and obstruction convictions, U.S.S.G § 2C1.1(a), applied a four-level adjustment for Hornsby being in a position of policy decision-making, § 2C1.1(b)(3), applied a fourteen-level adjustment for loss, § 2C1.1(b)(2), and then applied a two-level enhancement for obstruction of justice, §§ 2C1.1(c)(2), 2X3.1, and 2J1.2. J.A. 3168-69. The district court then considered 18 U.S.C § 3553(a) factors. In considering these factors, it primarily focused on Hornsby's conduct with respect to honest-services fraud. Indeed, the district court did not conduct any separate analysis regarding the appropriateness of the seventy-two month sentences for witness and evidence tampering and obstruction of justice. Instead, the court stated its rationale for imposing the seventy-two month sentences for the honest-services fraud convictions, and then, without further explanation, imposed the same sentences for all tampering and obstruction convictions to run concurrently. As a result, the record is insufficient for us to assess the reasonableness of the tampering and obstruction sentences separate from the now-reversed honest-services fraud convictions. *See United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (stating that "[p]rocedural errors include . . . failing to consider the § 3553(a) factors . . . or failing to adequately explain the chosen sentence . . . .").

Faced with the tampering and obstruction convictions only, the district court may determine that the seventy-two month sentences are inappropriate. This possibility is not unlikely given that the district court sentenced Hornsby below the recommended range for all convictions because it found that the range did not reflect the circumstances of Hornsby's crimes and criminal history.[8] Because we cannot conclude that, "it was reasonably certain that the judge would have imposed the

---

[8]The district court did not sentence Hornsby within the recommended guidelines range of 151 to 188 months, but rather sentenced him to 72 months.

same sentences even if the [erroneous] charge of honest-services fraud had not been submitted to the jury," we vacate the sentences and remand to the district court for re-sentencing. *Black*, 625 F.3d at 389, 393-94 (reversing the honest-services fraud convictions based on a conflict of interest and remanding the case for re-sentencing on the remaining convictions); *Riley*, 621 F.3d at 339 (same); *United States v. Coniglio*, 417 F. App'x 146, 151 (3d Cir. 2011) (same).

### III.

For the foregoing reasons, we reverse the convictions of honest-services fraud (counts 6, 7, and 10), and affirm the convictions of evidence and witness tampering (counts 19 and 20) and obstruction of justice (count 22). We vacate the sentences and remand the case for re-sentencing of counts 19, 20, and 22.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*VACATED IN PART,*
*AND REMANDED*