TRAXLER, Chief Judge,
concurring in part and dissenting in part:
I agree that the evidence was sufficient to support Pitt’s mail fraud convictions, and I therefore concur in Section II.A of the majority opinion. I likewise agree that the district court’s jury instructions, though proper when given, were improper in light of the Supreme Court’s opinion in Skilling v. United States, — U.S. —, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). I am convinced, however, that the Skilling error was harmless beyond a reasonable doubt, and I therefore dissent from the reversal of Pitt’s convictions.
I.
18 U.S.C.A. § 1341 prohibits use of the mails to further “any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.” 18 U.S.C.A. § 1346 defines “scheme or artifice to defraud” to include “a scheme or artifice to deprive another of the intangible right of honest services.” In Skilling, the Supreme Court held that, to avoid constitutional questions of vagueness, honest-services fraud under § 1346 must be limited to the conduct at the core of the doctrine as historically applied: “fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived.” Skilling, 130 S.Ct. at 2928. In so limiting § 1346, the Court specifically rejected the argument that the honest-services doctrine should encompass conflict-of-interest cases — those involving “undisclosed self-dealing by a public official or private employee” or “the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty.” Id. at 2932 (internal quotation marks omitted).
The indictment in this case alleged that Pitt and his co-defendants devised a scheme to defraud the Housing Authority of Winston-Salem (“HAWS”) and the public of both the $414,000 in HAWS funds used to buy Lansing Ridge and Pitt’s honest services. The honest-services theory, however, should not have been submitted to the jury because there were no allegations in the indictment or evidence at trial of bribes or kickbacks. And because the jury returned a general verdict, we cannot determine whether the verdict rested on the (now) invalid honest-services theory or on the (still) valid pecuniary fraud theory.
Constitutional error arises when a jury is instructed on alternative theories of criminal liability and returns a general verdict of guilty that might have rested on a theory that was invalid as matter of law. See Yates v. United States, 354 U.S. 298, 311-12, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). While Pitt’s convictions are “flawed” by the Yates error, “errors of the Yates variety are subject to harmless-error analysis.” Skilling, 130 S.Ct. at 2934.
To determine whether a Yates alternative-theory error is harmless, “the relevant appellate inquiry is whether the error was harmless beyond a reasonable doubt.” United States v. Jefferson, 674 F.3d 332, 361 (4th Cir.2012). “Accordingly, a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory if the court can conclude ‘beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.’ ” Id. (quoting Neder v. United States, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).
Because Pitt did not argue below that § 1346 was unconstitutionally vague or object to the mail-fraud instructions when given, his Skilling claim must be viewed *799 through the prism of plain-error review, as the majority concludes. The primary difference between harmless-error review and plain-error review, of course, is the allocation of the burden of persuasion. Under harmless-error review, the government bears the burden of establishing that the error was not prejudicial; under plain-error review, the defendant bears the burden establishing that he was prejudiced by the complained-of error. See United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
This court has held that to prevail on a Yates claim under plain-error review, the defendant “must demonstrate that the erroneous instruction given resulted in his conviction, not merely that it was impossible to tell under which [theory] the jury convicted.” United States v. Robinson, 627 F.3d 941, 954 (4th Cir.2010) (internal quotation marks and alterations omitted). Because I believe that Pitt’s claim fails even under the more generous (to Pitt) standards of harmless-error review, I will analyze Pitt’s claims under the harmless-error standard rather than the much stricter plain-error standard set out in Robinson.
II.
Determining whether a Yates or other instructional error was harmless requires an examination of the evidence presented at trial and the district court’s instructions to the jury. See, e.g., United States v. Hornsby, 666 F.3d 296, 305-06 (4th Cir.2012). Accordingly, I will first set out the relevant facts (in a bit more detail than is contained in the majority opinion) before explaining why I believe the error was harmless beyond a reasonable doubt.
A.
Pitt was appointed to the HAWS Board of Commissioners in 1998, and he served as Board chairman during the time period relevant to this appeal. Board commissioners, as fiduciaries, are obligated to serve the interests of HAWS, and they may not use their positions to serve their own interests. North Carolina law specifically prohibits housing authority commissioners from acquiring an interest in any housing authority project or property to be included in any such project, see N.C. Gen.Stat. § 157-7, and it requires any commissioner who already has an interest in property being considered for a housing project to immediately disclose his interest to the authority in writing, see id.
HAWS receives almost all of its funding from the Department of Housing and Urban Development (“HUD”), and its use of those funds are governed by “Annual Contribution Contracts” between HAWS and HUD. The annual contracts — which were signed by Pitt during his tenure as chairman — contain a conflict-of-interest clause that prohibited HAWS from entering into contracts for projects in which former or current HAWS Board members had a direct or indirect interest.
Pitt and co-defendant Thomas Trolling-er, through their limited-liability company known as East Pointe Developers (“EPD”), owned Lansing Ridge, a 41-lot subdivision in east Winston-Salem. EPD had built low-income housing on 18 lots, leaving 23 undeveloped lots. In April 2002, when he was serving as Chairman of HAWS, Pitt met with Jeff Corbett, owner of Wolfe Investments, to discuss a sale of Lansing Ridge. According to Corbett, Pitt told him that because of an unexplained (to Corbett) “relationship” with HAWS, Pitt had a conflict-of-interest that prevented him from developing the remaining lots at a profit. J.A. 207. Pitt, however, claimed that he could provide Corbett with buyers who had been pre-qualified through a HAWS program, a promise that made Lansing Ridge attractive to Corbett. Wolfe agreed to buy the 23 undeveloped lots for $358,000. To fi *800 nance the purchase, Wolfe borrowed $249,000 from a trust fund, which held a first-priority deed of trust to secure the loan. EPD provided seller-financing for the remaining portion of the purchase price and also made a separate $75,000 loan, securing both by a second-priority deed of trust in the amount of $183,000.
Pitt did not refer buyers as promised, and Wolfe was unsuccessful in developing the Lansing Ridge property. When Cor-bett told Pitt that he was having difficulty making the mortgage payments and needed to sell the property, Pitt told Corbett not to sell to a third party and that HAWS might be interested in purchasing Lansing Ridge.
At an October 2002 meeting of the Board, Pitt introduced a resolution authorizing the executive director to enter into negotiations to buy the Lansing Ridge lots for development under HUD’s “Hope VI” housing program. Pitt did not disclose his interest in Lansing Ridge or his role as a partner in EPD at that meeting, and the Board approved the resolution. The resolution authorized negotiations only; the property could not be purchased without further authorization from the Board.
Reid Lawrence, HAWS’ executive director and one of Pitt’s co-defendants, began negotiating with Corbett for the purchase of Lansing Ridge. In May 2003, Corbett and HAWS entered into a contract giving HAWS a 120-day exclusive option to purchase the Lansing Ridge lots for $414,000. The option contract was not presented to the Board for approval, nor was the Board otherwise given an opportunity to consider the proposed purchase.
Before HAWS acted on the option, a foreclosure proceeding was commenced by the trust fund holding the first deed of trust on the Lansing Ridge lots. Because foreclosure on the senior deed of trust would extinguish all junior liens, EPD’s attorney advised Pitt and Trollinger to bid for the lots at the foreclosure sale to protect EPD’s $183,000 interest in Lansing Ridge.
Shortly thereafter, Pitt, Trollinger, and Lawrence agreed that Trollinger would purchase the Lansing Ridge lots at the foreclosure sale and that HAWS would then buy the lots from Trollinger for $414,000. The parties agreed that Trol-linger would buy the property in his own name rather than in EPD’s name so as to conceal Pitt’s interest in the property. Trollinger understood that HAWS would not bid on the property at the sale.
The foreclosure sale was held on July 30, 2003. Trollinger and Lawrence were both present at the sale, but Trollinger was the only bidder at the sale. His successful bid was $285,100 — $100 over the amount owed on the first deed of trust. To finance the purchase, EPD obtained a short-term loan of $220,000, and Pitt and Trollinger individually contributed the balance of the purchase price.
Trollinger’s $285,100 bid became final on August 12, 2003, after expiration of the ten-day “upset bid” period. Less than a week later, HAWS was under contract to buy the property for $414,000. The foreclosure sale of Lansing Ridge to Trollinger was finalized on August 27, 2003; the next day, Trollinger sold Lansing Ridge to For-syth Economic Venture (“FEV”), a wholly-owned subsidiary of HAWS. As chairman of the HAWS Board, Pitt also served as FEV’s president; Lawrence, HAWS’ executive director, also served as FEV’s vice-president.
Trollinger and Lawrence both attended the closing of the sale to FEV. Trollinger informed the attorney handling the closing that he had assigned his foreclosure bid to EPD.[1] Although Pitt was an equal partner *801 with Trollinger in EPD, Trollinger told the closing attorney that he was EPD’s sole member. The attorney made the necessary changes in the documents and proceeded to close the sale. She testified, however, that she would not have continued with the closing if she had known about Pitt’s interest in the lots. Pitt and Trollinger used the proceeds from the sale to satisfy the short-term loan taken out by EPD and then distributed the remainder to themselves, with each one writing a check to the other for $84,000.
The funds used to buy Lansing Ridge had been loaned to FEV by HAWS and were wired, at Lawrence’s direction, from HAWS’ general account to the closing attorney. At the time of the wire transfer, the general account contained primarily federal funds. A few months after closing, Pitt obtained a commercial loan on FEV’s behalf and used the proceeds of that loan to repay HAWS for the funds advanced at closing. The Board never authorized the purchase of the Lansing Ridge lots, nor did the Board authorize the various loan transactions used to structure the purchase.
The government’s evidence established that Lansing Ridge property was not well-suited for use as an affordable-housing development. Among other things, the property was poorly graded, and extensive remediation of low-lying, poorly draining land would be required for some of the lots to be “buildable.” J.A. 835. As of the time of Pitt’s trial, HAWS had made five unsuccessful attempts to sell the property.
Pitt’s interest in Lansing Ridge came to light in December 2004, after Lawrence sought HUD approval to use the property in the Hope VI program. HUD discovered Pitt’s conflict of interest while reviewing the request, and HUD thereafter refused to waive the conflict of interest and denied approval for the property. The effect of HUD’s denial was to preclude HAWS from using any federal housing funds to develop or maintain Lansing Ridge. Pitt resigned from the Board in January 2005 after being questioned about his conflict of interest by a HAWS attorney.
The government charged Pitt, Trolling-er, and Lawrence in a ten-count indictment; Trollinger and Lawrence pleaded guilty, and Pitt proceeded to trial. The indictment charged Pitt with one count of wire fraud, four counts of money laundering, and two counts of mail fraud. The jury found Pitt guilty of the mail-fraud charges but was unable to reach a verdict on the other charges.
B.
Both mail-fraud counts (counts six and seven) alleged pecuniary fraud under § 1341 and honest-services fraud under § 1346, and the district court instructed the jury on the alternative theories of pecuniary fraud and honest-services fraud. Although it was error under Skilling to submit the honest-services theory to the jury, the question is whether “the jury [would] have still convicted [Pitt] had it not been told that in addition to the valid money/property fraud allegations, an allegation of honest services fraud could also be taken into consideration.” United States v. Segal, 644 F.3d 364, 366 (7th Cir.2011), cert. denied, — U.S. —, 132 S.Ct. 1739, 182 L.Ed.2d 557 (2012). My review of the record convinces me beyond a reasonable doubt that the jury would have convicted Pitt of pecuniary mail fraud had the honest-services theory not been submitted to it..
*802 The government’s theory of the case was, in essence, that Pitt committed honest-services fraud as part of and in furtherance of his overarching plan to commit pecuniary fraud. See J.A. 1259-60 (arguing in closing that “Pitt violated his duty of honest services ... and personally benefited from his position as chairman of the board. And that benefit was in the amount of $84,000.... that the evidence shows went to Mr. Pitt and not the lower-income people of the city of Winston-Salem.”); J.A. 1268-69 (“[F]ollow the money from HUD to the Housing Authority to the $413,000 check to [EPD] that Mr. Trol-linger testified he gave to Mr. Pitt to this check which goes directly to Mr. Pitt’s bank. Follow the money.”). As is apparent from the allegations in the indictment and the facts outlined above, the pecuniary fraud and honest-services fraud charges arose from and were premised on the same underlying set of facts — Pitt’s efforts to orchestrate the purchase of Lansing Ridge by HAWS for his own direct financial benefit. The government’s evidence of fraud, therefore, was as applicable to the pecuniary fraud theory as it was to the honest-services theory. For example, evidence of the plan to have Trollinger, in his own name, buy Lansing Ridge at the foreclosure and immediately resell it to HAWS at a pre-determined and substantially higher price establishes a scheme to defraud under either theory, and Pitt’s repeated failures to disclose his interest in Lansing Ridge to the Board and Trollinger’s lies to the closing attorney about the ownership of EPD are material misrepresentations or concealments under either theory.[2] And as to specific intent, which “may be inferred from the totality of the circumstances and need not be proven by direct evidence,” United States v. Ham, 998 F.2d 1247, 1254 (4th Cir.1993), the record is replete with supporting evidence relevant to either theory, not the least of which is Trollinger’s unequivocal testimony that the purpose of buying the property in his name was “[t]o conceal Mr. Pitt’s interest in the property.” J.A. 720. Moreover, the critical evidence supporting the mail-fraud charges was effectively uncontroverted. Pitt did not testify or present other evidence directly contradicting the factual substance of the government’s evidence. Although counsel for Pitt attempted to show through cross-examination that Pitt did not conceal his interest in the property and had no intent to defraud because his involvement with EPD was already known to the Board, the guilty verdicts show that the jury necessarily rejected that claim.
Accordingly, I believe that the largely uncontroverted evidence establishing honest-services fraud likewise established pecuniary fraud. I see nothing in that evidence, or in the government’s arguments, or in the court’s instructions, that could rationally lead to a conviction for honest-services fraud but an acquittal on pecuniary fraud. See United States v. Skilling, 638 F.3d 480, 482 (5th Cir.2011) (finding Yates error harmless after remand from Supreme Court and explaining that relevant inquiry is “whether the record contains evidence that could rationally lead to an acquittal with respect to the valid theory of guilt” (internal quotation marks and alterations omitted)), cert. denied, — U.S. —, 132 S.Ct. 1905, 182 L.Ed.2d 807 *803 (2012); United States v. Black, 625 F.3d 386, 393 (7th Cir.2010) (after remand from Supreme Court, finding Yates error harmless as to one count because “[n]o reasonable jury could have acquitted the defendants of pecuniary fraud on this count but convicted them of honest-services fraud”), cert. denied, — U.S. —, 131 S.Ct. 2932, 180 L.Ed.2d 238 (2011). Because the pecuniary fraud and honest-services fraud claims were so closely related and were premised on the same set of largely uncon-troverted facts, I have no difficulty concluding that the error in submitting the honest-services theory to the jury was harmless beyond a reasonable doubt. See Jefferson, 674 F.3d at 364 (finding Yates error harmless because the “alternative theories of liability were coextensive”).
Judge Gregory, however, seems to believe that the close relationship between the fraud counsels against a finding of harmlessness. According to Judge Gregory, the government’s case was always and only an honest-services-fraud case that focused on Pitt’s failure to disclose his interest in Lansing Ridge rather than on the money from the sale of the property. Judge Gregory minimizes the significance of the pecuniary fraud, asserting that the evidence showing that Pitt personally profited from the sale was offered “primarily as a motive to engage in honest-services fraud rather than as an independent theory of guilt.” Opinion of Judge Gregory, op. at 792. While I agree that money from the sale of Lansing Ridge provided the motive for Pitt’s fraud, I am puzzled by the view that Pitt’s obvious pecuniary motive somehow makes it less likely that the jury would have convicted Pitt of pecuniary fraud.
Judge Gregory does not explain, nor is it apparent to me, why the interrelatedness of the theories makes the error harmful rather than harmless. The very formulation of the harmlessness inquiry — whether the record contains evidence that could rationally lead to an acquittal with respect to the valid theory of guilt — suggests that a close connection between the valid and invalid theories would make it more likely, not less likely, that the error would be harmless, as courts have often concluded. See, e.g., United States v. Rodrigues, 678 F.3d 693, 701-02 (9th Cir.2012) (agreeing with district court’s analysis that Yates error was harmless because the same facts establishing the invalid honest-services theory likewise established that defendant received kickbacks); Jefferson, 674 F.3d at 364 (Yates error harmless because alternative theories “were co-extensive”); United States v. Coppola, 671 F.3d 220, 238 n. 12 (2d Cir.2012) (Yates error “harmless under any conceivable standard” where proof of the invalid theory “necessarily establishes the facts required to show” the valid theory)-
I recognize, of course, that there are cases where the intertwining of the alternate theories might preclude a finding of harmlessness — for example, where the jury instructions jumbled the theories in ways that the jury could not have sorted out, see United States v. Riley, 621 F.3d 312, 324 (3d Cir.2010), or where the evidence supporting the invalid legal theory was strong but the evidence of the valid theory was weaker, see Black, 625 F.3d at 392 (Yates error not harmless as to one count where the evidence of pecuniary fraud was “not conclusive” but the evidence of honest-services fraud was “irrefutable”). In this case, however, the jury instructions did not mix concepts of pecuniary and honest-services fraud, and the evidence of pecuniary fraud was extremely strong. And in my view, it is the strength of that evidence and its relationship to the honest-services fraud evidence that makes the Yates error harmless.
*804 At the same time that he finds the error not harmless because the fraud theories are too related, Judge Gregory also contends the error was not harmless because the theories are too different. Judge Gregory posits that a conviction for pecuniary fraud requires proof the defendant specifically intended to defraud another of a pecuniary interest, while a conviction for honest-services fraud requires proof of a specific intent to defraud another of the intangible right to honest services. Because “an honest-service fraud conviction does not necessitate a pecuniary fraud conviction,” Opinion of Judge Gregory, op. at 793, the jury’s conclusion that “Pitt intended to defraud HAWS of its right to his honest services does not compel the conclusion that he also intended to deprive HAWS of a pecuniary interest,” id., and the Yates error therefore cannot be harmless.
I am not entirely sure I understand this analysis. Alternative theories of guilt are “alternative” because they differ from each other in some respect. If an alternative-theory error can be harmless only if the alternate theories have identical elements proved through identical evidence, alternative-theory errors would never be harmless.
In any event, as previously discussed, the government’s evidence established that the whole point of buying Lansing Ridge at the foreclosure sale was to immediately turn around and sell it to HAWS at a price high enough to protect Pitt’s undisclosed financial interest in the property, and it is irrefutable that Pitt pocketed $84,000 of the HAWS-supplied funds used to buy Lansing Ridge. While the instructions permitted the jury to convict Pitt of honest-services fraud even if HAWS did not suffer a loss, the instructions also explained that a defendant acts with intent to defraud by acting “knowingly and with the specific intent to deceive someone ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to oneself.” J.A. 1339. The evidence demonstrated beyond question that HAWS in fact suffered a financial loss by paying an inflated price for property that is unsuitable for development as low-income housing and for which federal housing funds cannot be used to make suitable. In the face of this evidence, any reasonable jury concluding that Pitt intended to defraud HAWS of his honest services would also have found that he intended to defraud HAWS of money.
Judge Gregory and Judge Wynn in their separate opinions both distinguish the cases (discussed above) where Yates errors have been found to be harmless in the same manner. They note that while the jury here could not reach a verdict on the money-laundering charges, the juries in the above-discussed cases convicted the defendants of “additional and related charges [that] ameliorated the problem of the infirm honest services charge.” Opinion of Judge Gregory, op. at 793; Opinion of Judge Wynn, op. at 796. An instructional error, of course, can be found harmless even if the count affected by the error is the only count of which the defendant was convicted. And while a jury’s decision to convict a defendant of other charges is relevant to the harmlessness inquiry, the same cannot be said about a jury’s inability to reach a verdict. As this court recently explained when declining to consider hung-jury counts when determining whether a Skilling error was harmless, “[a] jury’s ‘failure to reach a verdict cannot — by negative implication — yield a piece of information that helps put together the trial puzzle.’ ” United States v. Hornsby, 666 F.3d 296, 305-06 n. 4 (4th Cir.2012) (quoting Yeager v. United States, 557 U.S. 110, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009)).
Unlike the pleadings, the jury charge, or the evidence introduced by the parties, *805 there is no way to decipher what a hung count represents.... A host of reasons — sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few — could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury’s failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return.
Yeager, 557 U.S. at 121-22, 129 S.Ct. 2360 (emphasis added; footnotes omitted). The harmlessness inquiry here requires us to determine whether a rational jury would have found Pitt guilty without the improper honest-services instruction; speculation about the meaning of the jury’s inability to reach a verdict on some counts should play no part in the analysis, see id. at 122, 129 S.Ct. 2360.
III.
As this court recently explained, “a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory if the court can conclude beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.” Jefferson, 674 F.3d at 361 (emphasis added; internal quotation marks omitted). After reviewing the record, I am convinced beyond a reasonable doubt that if the erroneous honest-services theory had not been submitted to the jury, the jury would have convicted Pitt of pecuniary fraud. Because the Yates error was harmless beyond a reasonable doubt, I respectfully dissent from the reversal of Pitt’s convictions.

. Trollinger testified that he assigned his winning foreclosure bid to EPD without Pitt's *801 knowledge, so as to avoid capital gains taxes after the resale of the property to HAWS. Trollinger testified that Pitt was not happy when he learned of the assignment.

. Although the Court in Skilling held that honest-services fraud does not encompass undisclosed conflict-of-interest cases, see 130 S.Ct. at 2932, Skilling does not preclude the prosecution under § 1341 of a conflict-burdened defendant who commits pecuniary fraud, nor does it somehow render evidence of an undisclosed conflict irrelevant or inadmissible in a § 1341 pecuniary fraud case. See, e.g., United States v. Joshua, 648 F.3d 547, 554 (7th Cir.2011) (finding "nothing objectionable” about the use of the same evidence to support allegations of monetary fraud and honest-services fraud).