**UNITED STATES of America**

v.

**Constance G. POST and Wayne Charles, Defendants.**

**Case No. 08–CR–243 (KMK).**

United States District Court,
S.D. New York.

June 3, 2013.

Clinton W. Calhoun, Esq., Calhoun & Lawrence, White Plains, NY, for Defendant Constance G. Post.

Richard D. Willstatter, Esq., Green & Willstatter, White Plains, NY, for Defendant Wayne Charles.

Cynthia K. Dunne, Esq., Andrew S. Dember, Esq., Office of the United States Attorney, Southern District of New York, White Plains, NY, for the Government.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge.

Defendants Constance G. Post and Wayne Charles ("Defendants") were convicted in this Court, following a four-week jury trial, of one count each of mail fraud or honest services fraud and conspiracy to commit mail fraud or honest services fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 1349. Defendant Charles was also convicted of one count of making false statements relating to the alleged schemes in violation of 18 U.S.C. § 1001. Defendants have filed a motion to dismiss the Indictment as to the mail fraud and conspiracy counts pursuant to Federal Rule of Criminal Procedure 12(b)(3), arguing that the Supreme Court's decisions in *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) and *Black v. United States*, 561 U.S. 465, 130 S.Ct. 2963, 177 L.Ed.2d 695 (2010), decided after their trial, undermine the basis for their convictions on the so-called "honest ser-

vices" theory of mail fraud. Charles also seeks a new trial on the false statements count. For the reasons stated herein, the motion is granted in part and denied in part.

## I. Background

### A. Facts

#### 1. The Indictment

From 1998 through 2005, Constance G. Post was the Commissioner of the Mount Vernon Department of Planning and Community Development and Executive Director of the Mount Vernon Department of Planning and Urban Renewal Agency ("MVURA") in Mount Vernon, New York ("the City"). (Indictment ¶ 1.) Her duties included, among other things, the supervision of these agencies; controlling, disbursing, and accounting for the funds the agencies received from the U.S. Department of Housing and Urban Development ("HUD"); making recommendations to the MVURA board for the allocation of MVURA's spending; and reviewing invoices submitted to the agencies by vendors and outside contractors. (Id.) During this time, Wayne Charles was an owner of investment properties in Mount Vernon. (Id. ¶ 4.) Post and Charles had a close personal and financial relationship. (Id. ¶ 5.)

The Indictment outlined three schemes allegedly committed by the two Defendants, whereby Post helped Charles acquire funds her agencies had received from HUD or other business with the City of Mount Vernon. (Id.) First, between 1998 and 2002, Charles submitted proposals to provide computer services to the City through a company called "Micros Only," and Post recommended that the MVURA board accept the Micros Only bids (the "Micros Only scheme"). (Id. ¶ 7.) Unbeknownst to the MVURA board, however, "Micros Only," though at one time an actual computer services company, allegedly was a front company for another company created by Charles to receive payments on the City contracts, a company that had no experience in the computer industry. (Id. ¶ 8.) Post and Charles concealed from the City Charles's personal relationship with Post and also Charles's involvement with Micros Only. (Id. ¶ 9. ) Second, in 1999 Post recommended that MVURA loan The Charles Group, a real estate development entity owned by Charles, $500,000 to develop a property it had purchased (the "$500,000 loan scheme"). (Id. ¶ 11.) Though the loan had various terms, including a requirement of interest payments, The Charles Group did not make the interest payments until after federal investigators contacted Post in 2005, and Post did not enter the loan into MVURA's books and records until that time. (Id. ¶¶ 11–13.) Third, from 1999 to 2002, Post approved the disbursement of $40,000 of HUD money for services rendered by third parties on properties owned by Charles-controlled entities, again without disclosing her relationship with Charles. (Id. ¶¶ 14–15.)

The Indictment charged the Defendants with a conspiracy intended "to devise a scheme and artifice to defraud, and to deprive the City of Mount Vernon and its citizens of their intangible right to the honest services of Constance G. Post and to deprive the City of Mount Vernon, its citizens and HUD of money and property." ("Count 1") (Id. ¶ 18.) The conspiracy was allegedly accomplished by the Defendants concealing, among other things, Charles's connection with Micros Only and Post's financial and personal relationship with Charles. (Id. ¶ 17.) The substantive mail fraud count ("Count 2") alleged use of the mails to send checks, correspondence, proposed contracts, and other items, all in furtherance of the same scheme. (Id. ¶ 20.) Finally, the Indictment alleged that Charles made false statements in 2006 in

the course of an investigation when he said 1) that his only business dealing with the City was the $500,000 loan, 2) that he had no financial interest in Micros Only, and 3) that he knew Micros Only was owned by two other people, Blanche and William Brown, and was a tenant in a building Charles owned. (*Id.* ¶ 21.)

### 2. The Trial

The Government's evidence consisted of numerous witnesses, documents, and recordings, presented to the jury over the course of four weeks. What follows is a summary of the evidence relevant to this motion.[1]

The evidence showed that Charles submitted a response to a "Request for Proposal" in 1998 to provide computer services to the City using the name Micros Only, even though the real Micros Only had been dissolved by 1998, and its co-founder testified that Charles had never had any role in the company. (Gov't Ex. 102–D; Tr. 128–42.) Charles then created a new company to receive payments on the contract. (Tr. 391, 393–413.) Post recommended that the MVURA board accept the Micros Only proposal. Post then approved invoices for the Micros Only contract, hired the company's workers, and directed that all Micros Only matters be directed to her personally. (Tr. 152, 774–79, 953–57, 1335–37; Gov't Ex. 200.) Post told City employees that a different man, Yigal Joseph, was the owner of Micros Only, (Tr. 630–33), and tried to make sure that Charles's name was not connected with the company, (Tr. 995–96, 1730–31). According to the testimony of Maureen Walker, a member of the MVURA board, Post approved services and payments in amounts

larger than the board had authorized. (Tr. 1514–31.)

The evidence supporting the $500,000 loan scheme was the same evidence used to prove the Micros Only scheme. In particular, the Government argued that Charles's loan application was fraudulent because it stated that Charles did not do business under other names and that Charles did not have other business with the City. (Tr. 1715–22; Gov't Exs. 1070A; 1072.) Through their participation in the Micros Only scheme, both Post and Charles knew these statements to be false. The Government also introduced evidence that Post received a $30,000 payment from Charles in 2004. (Tr. 3178–79.)

The prosecutor, in laying out the elements of mail fraud to the jury, described the two purposes of the Defendants' schemes as follows:

> First is that there was a scheme to defraud to obtain money and property or the intangible right of honest services by material, false and fraudulent pretenses, representation or promises, and that's you know, there's a lot in that sentence, but the lies, the concealment of material facts, important information that these defendants engaged in is what that's about. You know, they did it to obtain money and property, money under these contracts that they weren't entitled to. But *it's also there's something separate*, the judge is going to explain it to you, this intangible right to honest services, which is fraud related to Ms. Post using her official position and essentially engaging in a corrupt relationship with the defendant, Wayne Charles, which is what she did. The

---

1. Because this is in effect a motion for a new trial, the Court does not view the evidence in the light most favorable to the Government, as it would were this a motion for judgment of acquittal. *See United States v. Romero–Car-*camo, No. 07–CR–034, 2009 WL 1538082, at *2 (D.Conn. May 27, 2009) (citing *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir.2005)).

municipality of Mount Vernon is entitled to the honest services of its officials. (Tr. 3519 (emphasis added).)

Charles's defense in summation was that Dante Brown, the co-founder of Micros Only, did in fact submit a legitimate bid to provide the City with computer services, with Charles's help. But Brown then left the company, and subsequently lied about Charles's involvement. (Tr. 3579–88.) The costs incurred by the City resulted from the disorganization of City government, and, Charles argued, the City actually benefitted from hiring Micros Only. This was demonstrated in part by the fact that the efficiency of the administration of HUD Section 8 funds fell after Micros Only stopped providing the City with services. (Tr. 3593, 3606.) Further, according to Charles, the $500,000 loan was a legitimate loan, made by the City to facilitate the refurbishment of a "slum" property that only Charles was willing to undertake. (Tr. 3564–70.) Post's counsel also argued that Micros Only's services benefitted the City's administration of HUD funds. (Tr. 3655, 3672.) Her main defense was that her time was so consumed with her duties that there was no way she knew anything fraudulent was taking place, and that her activities were entirely consistent with the City's interest. (Tr. 3619–27.)

### 3. The Jury Instructions

The Court's summary of the charges tracked the Indictment. The jury was told that the alleged conspiracy was to "defraud the City of Mount Vernon, its citizens and [HUD] of money and property and to defraud the City of Mount Vernon and its citizens of the honest services of Ms. Post." (Tr. 3746.) The substantive mail fraud count was described in the same way. (Id. at 3747.) The jury was instructed that the first element of the mail fraud count was "that there was a scheme or artifice to defraud to obtain money or property or the intangible right of honest services by materially false and fraudulent pretenses, representations or promises...." (Id. at 3757.) Next, the Court instructed the jury on the meaning of a scheme to defraud, including the requirement that "[t]he false or fraudulent representation or failure to disclose must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision." (Tr. 3760.) For the final piece of the first element, the Court described what purposes the alleged scheme had to have:

> In addition to proving that a statement was false or fraudulent and related to a material fact, in order to establish a scheme to defraud, the government must prove that the alleged scheme contemplated depriving another of money or property or of the intangible right of honest services.

> However, the government is not required to prove that a given defendant himself or herself originated the scheme to defraud. Furthermore, it is not necessary that the government prove that any defendant actually realized any gain from the scheme or that the intended victim or victims actually suffered any loss....

> Federal law protects two kind[s] of interests from schemes to defraud through the use of the mails. The mail fraud alleged in Count Two alleges that the defendants intended to defraud victims of both of these interests. First, the interest in money and property, and second the interest in honest services. While both interests are charged in Count Two, in order to find either defendant guilty of that count, you need only find that the government has proven beyond a reasonable doubt that one of

these interests was implicated in this case but the jury must be unanimous as to which of the two theories has been proven. In other words, for a guilty verdict to be rendered on Count Two as to either defendant, all 12 jurors must agree either that the government has proven a scheme or artifice to defraud the City of Mount Vernon, its citizens and/or HUD, of money or property by means of false or fraudulent pretenses, representations or promises or else that the government has proven a scheme or artifice to defraud the City of Mount Vernon and its citizens of the intangible right of honest services of Constance G. Post, by means of false or fraudulent pretenses, representations or promises.

In order for you to find that there was a scheme to deprive the City of Mount Vernon, its citizens or HUD of money and property, you must find that some actual harm or injury was contemplated by the defendant you are considering. It is not necessary for the government to establish that any particular person actually relied on or actually suffered any loss or damages as a consequence of any false statement or omission of material fact. Nor need you find that the defendant you are considering profited from the fraud. It is enough for purposes of this first element if you find that a false statement or a statement omitting material facts was made as part of a fraudulent scheme in the expectation that it would be relied on. You must concentrate on whether there was such a scheme not on the consequences of the scheme.

In order for you to find that there was a scheme to deprive the City of Mount Vernon and its citizens of the honest services of Constance G. Post, you need not find that actual financial harm or injury was contemplated by the scheme. The right to honest services is the right that comes from a relationship of trust that one forms with another. A public official owes a duty of honest, faithful, and disinterested service to the public he or she serves and to his or her public employer. So, for instance, when a public official takes official action based on his or her own personal interests as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest, the official has breached his or her duty of honest, faithful and disinterested service. While outwardly purporting to be exercising independent judgment in his or her official work, the public official instead is otherwise influenced for his or her actual anticipated public conduct. Thus, the public is not receiving what it expects and is entitled to; namely, the public[ ] official['s] honest and faithful service. . . .

(Tr. 3761–63.) Defendants did not object to any of the instructions discussed above.

### 4. The Verdict

The jury found each Defendant guilty, by a general verdict form, on Counts 1 and 2, and found Charles guilty on Count 3. (Mar. 31, 2009 Tr. 12–13.)

### B. Procedural History

Defendants, each represented by new counsel, first filed the present motion on January 12, 2010. (Mot. for Dismissal of Counts One and Two and for a New Trial on Count Three Pursuant to Fed. R.Crim.P. 12(b)(3)(B) ("Defs.' Initial Mot.") (Dkt. No. 50).) The motion called the Court's attention to three cases then pending before the Supreme Court, *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), *Black v. United States*, 561 U.S. 465, 130 S.Ct. 2963, 177 L.Ed.2d 695 (2010), and *Weyhrauch v. United States*, 561 U.S. 476, 130 S.Ct. 2971, 177 L.Ed.2d 705 (2010) (per curiam). (Defs.' Initial Mot. 1–2.) These

cases presented the Supreme Court with the question whether the honest services statute, 18 U.S.C. § 1346, which had been at issue in Defendants' case, was unconstitutionally vague or should be construed in a manner that would exclude the conduct for which Defendants had been convicted. (*Id.* at 1–4.) The motion then argued that § 1346 was unconstitutionally vague on its face, that therefore Defendants' convictions rested on an improper ground, and that Charles's conviction for making false statements should also be vacated. (*Id.* at 6–9.) The Defendants requested that the Court defer sentencing until after the Supreme Court decided the three cases. (*Id.* at 10–11.) Although the Government opposed this, (Dkt. No. 55), the Court agreed to move Defendants' sentence to June 10, 2010, (Dkt. No. 54.) Defendants remain unsentenced. (Dkt. No. 68.)

In the meantime, Defendants made various other post-trial motions on January 22, 2010. (Defs.' Post–Trial Mots. (Dkt. No. 53).) In an order dated March 4, 2010, the Court concluded that this second set of motions was not untimely. (Dkt. No. 58.) The Parties submitted briefs on both sets of motions, and the Court held oral argument on February 9, 2011. The issues raised in Defendants' second set of motions were decided on the record at oral argument and in an order filed February 14, 2011. (Dkt. No. 82.)

## II. *Discussion*

The instant motion seeks dismissal of Counts One and Two of the Indictment (conspiracy and mail fraud) on the ground that the Indictment included an invalidated theory of honest services fraud, and that the resulting convictions were obtained, or might have been obtained, under that theory. (Supplemental Mem. of Law in Supp. of Defs.' Mot. for Dismissal ("Defs.' Mem.") (Dkt. No. 70) 4–5, 10–14.)[2] Charles

also seeks a new trial on the false statements count. (*Id.* at 15–17.)

### A. *Standard of Review*

Federal Rule of Criminal Procedure 12(b)(3)(B) provides in relevant part that "at any time while the case is pending, the court may hear a claim that the indictment . . . fails to invoke the court's jurisdiction or to state an offense." Fed.R.Crim.P. 12(b)(3)(B). Because this case is still "pending," the Court may consider Defendants' claim. *Cf. United States v. Davila,* 461 F.3d 298, 308 (2d Cir.2006) (defendant did not waive claim that indictment failed to allege element of the crime, asserted for the first time after trial). A defendant faces a "high standard" in seeking to dismiss an indictment, *United States v. Saliba,* No. 08–CR–792, 2010 WL 680986, at *2 (E.D.N.Y. Feb. 24, 2010) (internal quotation marks omitted), because an indictment need provide the defendant only "a plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed.R.Crim.P. 7(c)(1). The indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *see also United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998) (same); *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992) (noting that an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime" (internal quotation marks omitted)); *United States v. Seminerio,* No. 08–CR–1238, 2010 WL 3341887, at *6 (S.D.N.Y. Aug. 20, 2010)

---

**2.** The Court has abridged the lengthy title of this document.

(rejecting facial attack on honest services mail fraud indictment, noting that "the Indictment need not utter the 'magic words' *'quid pro quo'* or even 'bribe' or 'bribe receiving' or 'kickbacks'—so long as a jury could find that [defendant] understood that he was expected as a result of the payments to exercise particular kinds of influence as opportunities arose").

It is clear from their submissions and arguments that the Defendants' motion, though formally framed as a Rule 12(b)(3)(B) motion, is a broader challenge to the convictions than a simple argument about a defective indictment. Indeed, Defendants contend that the summations and jury instructions allowed Defendants to be convicted on a theory of honest services fraud that *Skilling* invalidated. That is a distinct claim from one alleging a technical defect in the Indictment initiating the prosecution, but the Court may still review the contention via a Rule 12(b)(3)(B) motion because an indictment's defects can affect a defendant's substantive rights at trial. *See United States v. Kakos,* 483 F.3d 441, 444–45 (6th Cir.2007) (although defendant waived procedural defects in indictment by failing to raise them before trial, the court of appeals could review, for plain error, any harm to the defendant from the jury instructions resulting from indictment's deficiencies); *United States v. Coiro,* 922 F.2d 1008, 1013 (2d Cir.1991) (where defendant argued on appeal that indictment was defective, the court of appeals would review for plain error because the alleged defect "[went] to whether the conduct proved is punishable under the statute charged").

In particular, Defendants contend that their convictions must be overturned because the Court committed what is called an "alternative-theory error." This error arose when the Court instructed the jury that it could convict on the mail fraud count based on *either* its finding of traditional pecuniary fraud *or* its finding of honest services fraud—but the Court's instructions on the honest services theory, though consistent with Second Circuit law at the time of trial, were rendered incorrect by *Skilling*.[3] As explained in further detail below, Defendants correctly identify an error derived from the Supreme Court's interpretation in *Skilling* of 18 U.S.C. § 1346, and they correctly note that *Skilling*'s interpretation of § 1346 applies to the present motion even though *Skilling* was decided after the trial occurred here. *See United States v. Andrews,* 681 F.3d 509, 518 n. 5 (3d Cir.2012) (holding that *Skilling* applies retroactively to cases tried before the Court's decision but in which judgment is not yet final); *see also Martignoni v. United States,* No. 10–CV–6671, 2011 WL 4834217, at *10 (S.D.N.Y. Oct. 12, 2011) (applying *Skilling* retroactively even on collateral review). Courts review this type of error for harmlessness pursuant to *Hedgpeth v. Pulido,* 555 U.S. 57, 129 S.Ct. 530, 172 L.Ed.2d 388 (2008) (per curiam), and related cases.

▆▆▆ In *Hedgpeth,* the Supreme Court reaffirmed that "[a] conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." 555 U.S. at 58, 129 S.Ct. 530

---

**3.** This error also allegedly infected the conspiracy count (Count 1) because the jury was instructed that, to find either Defendant had "knowingly and willfully joined the conspiracy," it had to find that a Defendant had to have "participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends." (Tr. 3752, 3755.) (Defs.' Mem. 9–10.). *See United States v. Musacchia,* 955 F.2d 3, 4 (2d Cir.1991) (remanding conspiracy conviction for new trial because it could not be determined on which of two substantive crimes, one of which was found to be legally improper, the conspiracy was based).

(citing *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) and *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)). The Supreme Court in *Hedgpeth* made explicit that such an "alternative-theory error" is not a "structural" one: that is, an alternative-theory error does not require vacatur of the conviction, but rather is subject to harmlessness analysis. *Id.* at 61, 129 S.Ct. 530. Under this standard, a court must determine whether "the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 58, 129 S.Ct. 530 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Two years later, *Skilling* clarified that *Hedgpeth*'s holding—which had come in the posture of a federal habeas review of a state conviction—"applies equally to cases on direct appeal." *Skilling,* 130 S.Ct. at 2934 n. 46.

■ Therefore, this Court must apply here the same harmless error review applicable to other instructional errors: specifically, "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *see also Hedgpeth,* 555 U.S. at 61, 129 S.Ct. 530 ("Although [cases such as *Neder*] did not arise in the context of a jury instructed on multiple theories of guilt, one of which is improper, nothing in them suggests that a different harmless-error analysis should govern in that particular context."); *United States v. Mahaffy,* 693 F.3d 113, 136 (2d Cir. 2012) ("An error

is harmless in th[e] context [of *Skilling* error] if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." (internal quotation marks omitted)); *United States v. Black,* 625 F.3d 386, 388 (7th Cir.2010) (noting that where a defendant attacks a mail fraud conviction for alternative-theory error after *Skilling,* "if it is not open to reasonable doubt that a reasonable jury would have convicted [the defendant] of pecuniary fraud, the convictions on the fraud counts will stand").

The familiar harmlessness analysis is complicated, however, by the fact that Defendants' first objection to the jury instructions on honest services fraud came in their post-trial motion, in which they argued for the first time that the honest services statute was unconstitutionally vague and that the jury instructions allowed for the possibility of conviction under an improper honest services theory alone. (Defs.' Initial Mot. (Dkt. No. 50) 5–7; *see also* Tr. 2563–89 (charge conference at which no objection was made to honest services instructions).)[4] Defendants' submissions now focus on the summations and jury instructions. (Defs.' Mem. 5–10.) Where defendants do not advance a challenge to the jury instructions until after the trial, but where that objection comes in the wake of an intervening change in the law, it is not quite clear what standard of review applies.

Typically, when objections are unpreserved, courts may review only for plain error. *See* Fed.R.Crim.P. 30(d) ("Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."); Fed.R.Crim.P. 52(b) ("A plain error that affects substan-

---

4. Defendants did not submit a request to charge before trial. Moreover, an objection is required *even if* a request to charge is initially submitted. *See United States v. Crowley,* 318 F.3d 401, 414 (2d Cir.2003) ("Rule 30 [of the

Federal Rules of Criminal Procedure] requires more than a request to charge."). Defendants also did not raise this issue in their Rule 29 motions at the close of the Government's case. (Tr. 3409–14.)

tial rights may be considered even though it was not brought to the court's attention."); *see also United States v. Al–Moayad,* 545 F.3d 139, 177 (2d Cir.2008) (reviewing for plain error district court's denial of request for supplemental charge made after deliberations had begun). However, some Second Circuit cases note that where "the source of an alleged jury instruction error is a supervening decision, [the Second Circuit] employ[s] a 'modified plain-error rule, under which the government, not the defendant, bears the burden to demonstrate that the error ... was harmless.' " *Mahaffy,* 693 F.3d at 136 (alteration in original) (quoting *United States v. Bahel,* 662 F.3d 610, 634 (2d Cir.2011)). But other Second Circuit cases have noted that the Supreme Court's 1997 decision in *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), "called into question the modified plain error standard of review" that the Second Circuit had previously articulated. *United States v. Botti,* 711 F.3d 299, 308 (2d Cir. 2013). Despite these express reservations, the Second Circuit "has frequently declined to reach the question of whether the modified plain error standard of review continues to apply when there has been a supervening change in the law after a conviction." *Id.*

■ Fortunately, given the uncertainty in the doctrine, in this case the choice of "regular" plain error review or "modified" plain error review does not make a difference. That is because the critical question of whether the substantive legal error affected the outcome of the trial is governed by the *Hedgpeth* harmlessness analysis, according to which the defendant bears the burden of showing the error was not harmless regardless whether the error was properly preserved. That is, even if Defendants had properly preserved the objection, they would still bear the burden of showing the error could have affected the outcome of the trial. *See Andrews,* 681

F.3d at 521 n. 10 ("*Skilling* error is not 'structural' and thus, [a defendant] bears the burden of demonstrating that the error was not harmless."); *United States v. Skilling (Skilling II),* 638 F.3d 480, 483–84 (5th Cir.2011) (on remand from the Supreme Court, applying *Hedgpeth* and *Neder* harmlessness standard where error had been properly preserved); *Martignoni,* 2011 WL 4834217 at *10 (same harmlessness inquiry applies even on petition for writ of error *coram nobis,* a form of collateral review, over 15 years after judgment of conviction was entered).

## B. Analysis

### 1. Skilling

Title 18 U.S.C. § 1341 criminalizes the use of the mails for the purpose of executing or attempting to execute a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. Following the Supreme Court's decision in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which cut off the "honest services" fraud theory that had developed using the language in § 1341, Congress supplemented the mail and wire fraud statutes with the current honest services statute, 18 U.S.C. § 1346. *See Skilling,* 130 S.Ct. at 2927 (recounting the history of the enactment of the honest services statute). Specifically, § 1346 further defines the phrase "scheme or artifice to defraud" as used in § 1341 to "include[ ] a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

In *Skilling,* Jeffrey Skilling, a former executive at Enron Corporation, challenged his honest services fraud conviction on a number of grounds, including that § 1346 was unconstitutionally vague. *Skilling,* 130 S.Ct. at 2925–26. In order to save the statute from vagueness concerns,

the Supreme Court construed § 1346 to cover only what the Court called the "core" of what had constituted honest services fraud prior to *McNally:* "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Id.* at 2928. Excluded from the statute's reach was conduct that merely constituted "undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 2932 (internal quotation marks omitted).

Applying the newly narrowed § 1346 to Skilling's conduct, the Court concluded that Skilling had not committed honest services fraud because the Government had not plead or alleged that Skilling was involved in a bribery or kickback scheme. *Id.* at 2934. But noting that Skilling had been charged with a conspiracy with three possible objects, only one of which was honest services fraud, the Court remanded the case to the Fifth Circuit for a determination of whether the error in Skilling's case was harmless. *Id.* at 2934–35. Applying *Hedgpeth*'s harmless error analysis, the Fifth Circuit on remand held the error harmless and affirmed the conviction on all counts. *Skilling II*, 638 F.3d at 488.

### 2. Defendants' Threshold Challenge to the Indictment Itself

Defendants' first contention is that the Indictment in this case failed to state an offense in light of *Skilling*, as the Indictment relied on a theory of honest services fraud that the Supreme Court has since ruled is not encompassed in § 1346. (Defs.' Mem. 4–5.) This contention fails.

It has "long [been] recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways." *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (holding that as long as the crime of conviction and its elements are fully spelled out in the indictment, the right to a grand jury is not violated if the indictment alleges additional claims or other means of committing the same crime). Thus, in assessing whether an indictment states an offense, a court may disregard as "surplusage" allegations that are extraneous and consider "whether the *remaining* allegations sufficiently allege a viable, independent offense." *United States v. Bermingham*, No. 02–CR–597, 2007 WL 1052600, at *2 (S.D.Tex. Apr. 5, 2007) (emphasis in original) (citing *Miller*, 471 U.S. at 136, 105 S.Ct. 1811) (holding that the inclusion of a "legally invalid theory intertwined in a single count with a remaining legally valid theory" does not violate the Fifth Amendment (internal quotation marks omitted)); *see also United States v. Eckhardt*, 843 F.2d 989, 997 (7th Cir.1988) ("Where a fraud scheme involves multiple objectives, some of which are insufficient to state an offense under *McNally*, the remaining charge or charges will be deemed sufficient to state the offense if they are 'easily separable' from the charges deemed insufficient. In such a case, those allegations which are insufficient to state an offense are mere surplusage, and do not taint the remainder of the indictment." (citation omitted)).[5]

---

5. The Supreme Court's decision in *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927), also supports this proposition. There, the indictment charged the defendants with conspiracy to transport liquor into the United States in violation of federal statutes and a treaty with Great Britain. *Id.* at 601, 47 S.Ct. 531. The Supreme Court rejected defendants' challenge to the "validity of the indictment" on the ground that the treaty "create[ed] no offense against the law of the United States." *Id.* at 602, 47 S.Ct.

■ The Indictment in this case, with the honest services allegations ignored because they do not include an allegation of a bribe or kickback scheme, still states an offense: that Defendants used and conspired to use the mails in furtherance of "a scheme and artifice to defraud ... and to deprive the City of Mount Vernon, its citizens and HUD of money or property." (Indictment ¶¶ 18, 20.) Thus, on its face, the Indictment need not be dismissed.

### 3. Defendants' Challenge to the Jury Instructions and Proof at Trial

#### a. Framework

Defendants' other challenges to their convictions are more complicated. Defendants contend that the Court's instructions on honest services fraud did not comport with *Skilling*, and that the jury was invited by the prosecutor's summations and invited by the instructions to convict the Defendants solely for "undisclosed self-dealing." (Defs.' Mem. 10.) Defendants correctly note that this is a theory of honest services fraud that *Skilling* expressly held was not covered by § 1346. (*Id.*) According to Defendants, because the Court instructed the jury that it could convict Defendants for engaging in honest services *or* pecuniary fraud, it is impossible to tell on which basis the jury based its verdict, and thus the mail fraud and conspiracy convictions must be vacated and a new trial held. (*Id.* at 12–15.)

■ The Government does not dispute, as it cannot, that the jury instructions were erroneous in light of *Skilling*. (Gov't Mem. 25.) In explaining to the jury the definition of "the intangible right of honest services," the Court did not instruct the jury of the need to find that Defendants "scheme[d] to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been

deceived." *Skilling*, 130 S.Ct. at 2928. To the contrary: the jury was instructed that it could find a deprivation of honest services when a public official "takes official action based on his or her own personal interests as when an official accepts a bribe *or* personally benefits from an undisclosed conflict of interest." (Tr. 3763 (emphasis added).) *Skilling*, however, expressly rejected the argument, advanced by the Government at trial here, that § 1346 covered, in addition to bribe and kickback schemes, "undisclosed self-dealing by a public official ...—*i.e.* ... action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Skilling*, 130 S.Ct. at 2932 (internal quotation marks omitted). Because the jury instructions here did not limit honest services fraud to schemes involving bribes or kickbacks, the instructions were erroneous and the error is plain. *See United States v. Riley*, 621 F.3d 312, 323 (3rd Cir.2010) (concluding that honest services jury instructions that did not charge a bribe or kickback scheme satisfied the first two requirements of plain error).

The question then is whether there is a "reasonable probability" that the error in the instructions "affected the outcome of the trial," *United States v. Marcus*, 560 U.S. 258, 130 S.Ct. 2159, 2164, 176 L.Ed.2d 1012 (2010); that is, "whether the error was harmless," *Andrews*, 681 F.3d at 521. Defendants contend there was such a probability that the outcome was affected, given their view that the jury instructions stressed to the jury that pecuniary fraud and honest services fraud were alternative theories of guilt, and that the jury needed to find only one in order to convict Defendants of mail fraud. (Tr. 3761–62 ("While

531. "This is true, but that part of the indictment is merely surplusage and may be rejected.... [A] useless averment is innocuous and may be ignored." *Id.*

both interests are charged in Count Two, in order to find either defendant guilty of that count, you need only find that the government has proven beyond a reasonable doubt that one of these interests was implicated in this case...."").) (Defs.' Mem. 13–14; Reply Mem. of Law in Supp. of Defs.' Mot. for Dismissal ("Defs.' Reply") (Dkt. No. 78) 5–6.) Moreover, Defendants argue, they had a defense to the pecuniary fraud theory: that Mount Vernon received value for the services performed by entities Charles controlled, Micros Only and The Charles Group. (Defs.' Reply 7–8.) This made it more likely the jury opted for the "easier" honest services theory, which, in Defendants view, would automatically render the error non-harmless.

In response, the Government makes three arguments that the Defendants are not entitled to a new trial. First, the evidence introduced at trial that Post received the $30,000 payment from Charles means the Government did in fact prove a "bribe or kickback scheme," as required by *Skilling.* (Gov't Mem. 34–39.) Second, the proof of pecuniary fraud was "overwhelming." (*Id.* at 29.) Third, any verdict the jury reached "necessarily" involved a finding of pecuniary fraud. (*Id.* at 33.)

### b. *Whether the jury found a bribe or kickback scheme*

 The Government's first argument, which tries to fit the honest services theory presented at trial into the "bribery and kickback" core of § 1346 that remains after *Skilling,* is insufficient. Whether or not the jury rationally could have concluded that the $30,000 payment was in fact a kickback, the jury was never instructed that it had to do so in order to find that the Defendants engaged in a scheme to deprive the City and its citizens of Post's honest services. Just as juries are presumed to follow the instructions they are

given, *see, e.g., United States v. Sabhnani,* 599 F.3d 215, 240 (2d Cir.2010), they cannot be presumed to have found facts or elements of offenses they are *not* instructed to find, *see United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990) (noting, where jury was not instructed on *Pinkerton* liability, that defendant's conviction could not be affirmed on that basis: "We may not permissibly infer either that the jury found [the defendant] guilty on a theory as to which it was not instructed, or that, had the jury been properly instructed on that theory, it would have found him guilty on that basis." (citations omitted)); *see also Camacho v. United States,* 204 F.Supp.2d 667, 675 (S.D.N.Y.2002) ("[A] reviewing court cannot uphold a conviction on a theory not charged to the jury.").

At trial, Defendants vigorously disputed that the $30,000 check was any kind of kickback. (Tr. 3595–96 (Charles's counsel in closing argument calling the Government's kickback theory "rank speculation" and proposing alternative theories for the $30,000 check).) *See United States v. Hornsby,* 666 F.3d 296, 307 (4th Cir.2012) (vacating conviction following *Skilling* error on an honest services conviction where the court could not say with "fair assurance" that the jury convicted the defendant on the basis of the alleged kickback and not an invalid conflict-of-interest honest services theory). The proof that the $30,000 check was a kickback was hardly overwhelming, and there was no other, related count of conviction that would allow a court to draw an inference that the jury found the existence of a bribe or kickback beyond a reasonable doubt. *Cf. United States v. Nouri,* 711 F.3d 129, 140 (2d Cir.2013) (alternative-instruction error harmless where the Second Circuit had "no doubt that, had the jury been properly instructed, it would have found the defendants guilty of honest-services wire fraud based on their scheme of concealed brib-

ery" in large part because the jury *also* convicted the defendants of violating the federal commercial bribery statute based on the same facts). Thus, the jury in this case cannot be presumed to have found the existence of a kickback scheme and therefore to have convicted on the basis of a valid "bribery and kickback" honest services theory.

### c. Whether the Court can be sure the Defendants were convicted of "money or property" fraud

The Government next argues that the error was harmless because the evidence for traditional, pecuniary fraud presented at trial was "overwhelming." (Gov't Mem. 29). This argument, by itself, cannot be enough to sustain Defendants' convictions, because there are other aspects to the harmlessness inquiry: the evidence at trial must be considered in the context of the jury instructions and the case as a whole. *See Andrews,* 681 F.3d at 522 (courts should consider, among other factors, whether the erroneous instructions were "interwoven" throughout the jury charge in the harmless error inquiry); *Skilling II,* 638 F.3d at 483 (finding the *Skilling* error harmless in part because the government's opening and closing statements made only brief reference to the invalidated honest services fraud theory). More broadly, a court assessing the harmlessness of a constitutional error asks "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). If it were true that overwhelming proof that a defendant committed some valid crime was *alone* sufficient to find instructional error harmless, then so long as the Government presents overwhelming evidence for conviction of *some* crime, a conviction could stand no matter how pervasively in-

correct instructions suffused the proceedings and how strongly the Government stressed the incorrect theory in its opening and closing statements.

Instead, courts undertake a multi-factor inquiry to determine whether the jury likely convicted on the basis of an invalid honest services fraud theory or a permissible money or property fraud alternative. The best way to begin to analyze this issue is to examine the recent cases addressing whether fraud convictions tried before *Skilling* must be reversed: over the last several years, a kind of common law corpus of *Skilling*-error cases has emerged. Indeed, the Second Circuit recently summarized this caselaw by saying that the Second Circuit "has reversed in cases tried before *Skilling* and decided on appeal after *Skilling* where the Government argued a non-bribery or -kickback scheme theory of honest services mail fraud, *or where the Government intertwined an alternative theory with a bribery or kickback scheme theory.*" *Botti,* 711 F.3d at 311 (emphasis added). Here, the invalid alternative theory was most assuredly "intertwined" with any other valid theory; it was far more than incidental. As described, though honest services fraud was not necessarily the Government's primary theory, it was given individualized attention explicitly in the Indictment, in the Government's opening and closing statements, and in the jury instructions. Thus, this case fits better with the cases that have vacated convictions than with cases where convictions have been affirmed following *Skilling* error. To see this clearly, it is useful to compare in detail a pair of paradigmatic cases that illustrate when convictions have been reversed in the wake of *Skilling* error and when they have been affirmed.

Judge Keenan's decision to grant a writ of error *coram nobis* in *Martignoni v. United States* is a good example of the

kind of instructional error that courts have found not harmless. In that case, Martignoni was an officer and options trader at the bank ABN AMRO, and the Government in 1992 indicted him on charges of bank fraud, making false entries in bank records, and conspiracy on the basis of a complicated scheme by which he hid various trading losses. 2011 WL 4834217 at *2–4. As part of the bank fraud counts, the district court instructed the jury that it could convict on those counts if the defendant engaged in a "scheme or artifice to defraud or obtain money, property, or to deprive the bank of the intangible right of honest services." *Id.* at *5. During deliberations, the jury sent a note asking for clarification of the legal definition of bank fraud, and the court responded that " 'a scheme or artifice to defraud includes a scheme or artifice to deprive another of the intangible right of honest services.' " *Id.* Martignoni was then convicted on all counts. *Id.* at *6.

Over 15 years later, in the wake of *Skilling,* Martignoni brought a petition for a writ of error *coram nobis,* and the district court vacated the counts prejudiced by this *Skilling* error. *Id.* at *7, *10. The district court noted that the instructions and the response to the note both were obviously incorrect in the wake of *Skilling. Id.* But, as importantly, the Government "made the honest services theory a central feature" of the relevant counts. *Id.* Thus, in its opening, the Government stated that the case was "not about a fraud to obtain money or a car or jewelry. It is about a fraud relating to something that you cannot see or touch. It is something intangible and it's something that the law recognizes as the intangible right to honest services. You will recognize it as just plain trust." *Id.* The Government made similar statements in closing, since it had "introduced evidence from which a reasonable jury could have concluded that Martignoni had no intent to deprive his employer of any property but did intend to deprive ABN AMRO of his 'honest services,' as that term was then understood." *Id.* Thus, because "[t]he focus of the trial was on an honest services theory," it was clear the court could not tell on which theory the jury convicted, and so the error was not harmless. *Id.*

Many other cases follow similar a pattern: where the evidence that would go to a valid conviction was not overwhelming and where the Government repeatedly urged the jury to convict purely on the basis of a conflict-of-interest theory, *Skilling* error has been found to be non-harmless. *See Mahaffy,* 693 F.3d at 136 (vacating honest services count following *Skilling* error where "there is a real possibility that the ultimate convictions with regard to honest services fraud were based on the jury's determination that the . . . Defendants deprived their employers of their honest services, although the jury may well not have concluded that bribery occurred."); *United States v. Bruno,* 661 F.3d 733, 740–41 (2d Cir.2011) (vacating conviction, with Government's explicit acknowledgment that vacatur was proper, where Government's primary theory at trial was that the defendant "fail[ed] to disclose material conflicts of interest and related material information"); *accord United States v. Wright,* 665 F.3d 560, 570–72 (3d Cir.2012) (honest services counts of conviction vacated where there was "ample evidence" that allowed the jury to convict on the basis of an honest services theory that "required nondisclosure of a financial interest that could conflict with a public official's duty to provide honest services" instead of a "bribery theory"); *Black,* 625 F.3d at 392 (certain honest services counts of conviction vacated where it was "unlikely" but possible that the jury "might have convicted the defendants of depriving the company of their honest services for private gain but

not have convicted them of pecuniary fraud").[6]

By contrast, for an example of a case where honest services convictions were affirmed following *Skilling*, consider the Third Circuit's decision in *Andrews*. In that case, Defendant Andrews was a contractor who wished to obtain the contract from the government of the U.S. Virgin Islands for necessary improvements to the territory's sewer system. 681 F.3d at 514. Andrews found a partner in the government in a man named Ohanio Harris, the Special Assistant to the Governor of the Virgin Islands, and the two attempted to work together to secure the contract for Andrews' company. *Id.* But Andrews' company did not have a Virgin Islands business license, so the two, among other things, fraudulently listed Harris as the president of the company. *Id.* Later, Andrews' company was awarded the contract, after Harris urged the Governor to employ Andrews' company and failed to send the contract out to bid. *Id.* at 514–15. Andrews also allegedly paid $2500 to Harris, a payment that may have been a gratuity for Harris's help in securing the contract. *Id.* at 514. Ultimately, Andrews' company

failed to render performance, and Andrews and Harris were charged with various fraud crimes, including honest services fraud. *Id.* at 516. Harris pleaded guilty, and Andrews was convicted following a jury trial. *Id.*

During the trial, the jury was instructed as to an invalid, conflict-of-interest honest services theory. *Id.* at 519–20. The invalid instructions were given multiple times, though they were far from the heart of the case, and the instructions misstated the law given *Skilling*'s holding. *Id.* at 520. Nonetheless, the Third Circuit upheld the conviction on the honest services counts because it found the error harmless under *Hedgpeth*. Noting that the inquiry "depends significantly on the context in which the instruction was provided and the other evidence presented at trial," *id.* at 522, the *Andrews* court examined several aspects of the trial. First, the court noted the Government "presented overwhelming evidence of tangible rights (pecuniary) fraud," because the testimony "established that the object of Andrews's fraudulent scheme was a tangible asset, that is, a multi-million dollar sewer repair contract from the [Government of the Virgin Islands]." *Id.* at

---

**6.** In the roster of cases where convictions were vacated, *United States v. Hornsby*, 666 F.3d 296 (4th Cir.2012), initially stands out as a case with strikingly similar facts to those here. In *Hornsby*, the defendant was the CEO of a public school system who was dating a saleswoman for an educational software company. *Id.* at 300–01. The defendant, without disclosing his romantic relationship, persuaded the school board to award a software contract to the company where his girlfriend worked. *Id.* at 301. There was also testimony that the girlfriend made a $10,000 payment to the defendant "[a]s a thank you for helping [her] with this deal." *Id.* at 302 (first alteration in original) (internal quotation marks omitted). Finding *Skilling* error in the honest services instruction, the Fourth Circuit vacated the conviction following a jury trial because the court could not say with "fair assurance" that the jury convicted the defen-

dant on the basis of the alleged kickback and not an invalid conflict-of-interest honest services theory. *Id.* at 307 (internal quotation marks omitted).

But while *Hornsby* is factually quite similar to this case, it is legally different because *Hornsby* was not an alternative instructional error case: that is, the jury does not appear to have been instructed that it could convict on the basis of money or property fraud as an alternative to honest services fraud. *See id.* at 306. Thus, there is an argument that, while this Court should follow *Hornsby* if the sole theory advanced was honest services fraud, the backstop of money or property fraud in this case demands a different outcome. But, as explained in more detail below, this argument fails because here the Government's money or property fraud theory was different from its honest services fraud theory.

525. Second, both the instructions and the indictment itself described specific schemes where the object was clearly "to fraudulently obtain the sewer repair contract, a tangible asset." *Id.* Third, the title of the challenged counts in the indictment did not mention, or cite statutory provisions relevant to, honest services fraud. *Id.* at 526. Fourth, the honest services theory did not go to the "heart" of the instructions but rather the district court "made only a few passing references to 'honest services.'" *Id.* Combining those factors, the court was satisfied that the jury convicted on the basis of a money or property fraud theory. *Id.*

Like *Andrews,* in cases where the invalid honest services theory was merely incidental to the case and another, properly instructed pecuniary fraud theory was the Government's predominant theory, convictions have been upheld following *Skilling* error. *See Black,* 625 F.3d at 393 (finding alternative-instruction error regarding honest services fraud harmless on certain counts where "[t]he only rational explanation for the . . . verdict" is that the defendants committed "pecuniary fraud"); *Skilling II,* 638 F.3d at 483, 484 (instructional error was harmless where evidence of securities fraud was "overwhelming" and the Government's opening and closings "mentioned the honest-services theory in relation to [the defendant] only once"); *see also Bereano v. United States,* 706 F.3d 568, 579 (4th Cir.2013) (affirming that instructional was error harmless where "[t]he core of the Government's case was the fraudulent billing scheme, which is primarily about money" (alteration in original) (internal quotation marks omitted));

*cf. Nouri,* 711 F.3d at 140 (alternative-instruction error harmless where the Second Circuit had "no doubt that, had the jury been properly instructed, it would have found the defendants guilty of honest-services wire fraud based on their scheme of concealed bribery," because the jury *also* convicted the defendants of violating the federal commercial bribery statute based on the same facts); *Botti,* 711 F.3d at 311 (conviction for honest services affirmed despite *Skilling* error—though not alternative-instruction error—where "bribery was the only theory that the evidence would support and the only theory that the Government argued at trial").[7]

Though this case seems to fall somewhere in between the center of gravity of each group of cases, the references to the invalid, conflict-of-interest honest services fraud theory were substantially more pervasive in this case than in *Andrews.* Here, the Court specifically instructed the jury on the honest services theory, the Indictment contains a paragraph describing Post's "positions of public trust," and the Indictment also notes that she "was under a duty to provide honest services by transacting City of Mount Vernon business honestly and openly." (Indictment ¶ 2.) Also, even though the Government stressed the pecuniary fraud theory, the Government made explicit mention of the honest services theory in its closing. (Tr. 3460 (the Government, in closing, noting that other officials must assume that Post is "providing honest services to the people of Mount Vernon"). *Contra* Tr. 3479 (noting that Post and Charles were "ripping off the City,"); Tr. 3494 (Charles was "in it for

---

7. On May 3, 2013, the Government submitted a letter addressing supplemental authority, and in the letter the Government stated that "Second Circuit cases that have considered *Skilling* errors . . . do not appear to be helpful—one way or the other—in resolving the pending motion." (Dkt. No. 83 at 1 (citing

*Bruno, Mahaffy, Nouri,* and *Botti* ).) While the Court agrees that these cases are not directly on point—hence the Court's especially heavy reliance on out-of-circuit cases and district court opinions—nonetheless there are aspects of the Second Circuit's decisions that are useful.

the money").) And, as stated, the jury here was expressly told that it *could* convict on honest services fraud and not pecuniary fraud. (Tr. 3762 ("The mail fraud alleged in Count Two alleges that the defendants intended to defraud victims of both ... the interest in money and property, and [also] the interest in honest services. While both interests are charged in Count Two, in order to find either defendant guilty of that count, you need only find that the Government has proven beyond a reasonable doubt that one of these interests was implicated in this case but the jury must be unanimous as to which of the two theories has been proven.") Thus, the invalid theory was in this case from Indictment to closing arguments to the jury instructions, and many places in between. Accordingly, unlike in *Andrews,* the Court cannot be confident that the error was "harmless beyond a reasonable doubt." *Neder,* 527 U.S. at 16, 119 S.Ct. 1827 (internal quotation marks omitted).

The Government responds by saying that, even if the Court cannot be sure the jury convicted on money or property fraud, it does not matter in the end because any honest services fraud conviction overlaps entirely with a money or property fraud conviction. That is, any reasonable jury that rendered a verdict that Defendants deprived the City and its citizens of their intangible right to Post's honest services *necessarily* did so on the ground that Defendants intended to deprive the City of its money or property. *See Black,* 625 F.3d at 392 ("[T]he question is therefore whether a reasonable jury might have convicted the defendants of depriving the [victim] of their honest services for private gain but not have convicted them of pecuniary fraud."); *see also Colino v. United States,* No. 11–CV–904, 2012 WL 1198446, at *13 (C.D.Cal. Apr. 9, 2012) (granting writ of error *coram nobis* to a defendant convicted of honest services fraud in 2005 where the court found it was "possible for Petitioner to have committed honest services fraud 'out of friendship' "). This issue is close, but ultimately the Government's argument is not persuasive.

At the outset, it is worth noting that the Government may be accused of some degree of shifting the ground under the Defendants. The Indictment contains two distinct theories of mail fraud. Namely, the Indictment alleges that "CONSTANCE G. POST and WAYNE CHARLES, the defendants, unlawfully, willfully and knowingly, ... devised and intend[ed] to devise a scheme and artifice to defraud, and to deprive the City of Mount Vernon and its citizens of their intangible right to the honest services of CONSTANCE G. POST and to deprive the City of Mount Vernon, its citizens and HUD of money and property." (Indictment ¶ 20.) From the very beginning, then, the two theories were distinct: there was the scheme to defraud Mount Vernon of Post's honest services on the one hand, and, on the other, the scheme to defraud Mount Vernon and HUD of money and property. This distinction between the two theories continued all the way to the end of the trial, when the Government, in its summation, told the jury: "You know, they did it to obtain money and property, money under these contracts that they weren't entitled to. But *it's also there's something separate,* the judge is going to explain it to you, this intangible right to honest services, which is fraud related to Ms. Post using her official position and essentially engaging in a corrupt relationship with the defendant, Wayne Charles, which is what she did." (Tr. 3519 (emphasis added).) Yet, now the Government argues, in essence: when we told the Court and the jury that honest services fraud and money or property fraud were "something separate," we did not really mean it literally, because, as the Government now puts it, "there is no plausible

honest services theory of conviction that would not necessarily incorporate money and property fraud." (Gov't Mem. 34.)

Actually, the Government's efforts to separate the two theories made it possible, even if unlikely, that the jury here did convict purely on the basis of a now-invalid honest services fraud theory, and that this conviction was not co-extensive with the Government's theory of money or property fraud. Recall that Post's official duties included the distribution of her agency's funds. (Indictment ¶ 1.) Honest performance of these duties entailed causing these funds to be disbursed based on the interests of the public. Thus, given Post's duties, Defendants contend the jury could have been persuaded by the evidence suggesting that Mount Vernon received value from the alleged transactions it entered into with Charles, and so the jury could therefore have convicted solely on the basis of the undisclosed conflict of interest. (Defs.' Reply 7.)

Defendants' description of the proof maps onto to the way even the Government itself characterized the proof. For instance, in the Government's opening statement, the Government told the jury that "it will not contend that the Charles companies ... did not perform any services for Mount Vernon. [W]e will never know if the services provided by Micros Only could have been performed at a lesser cost to the city or that the city could have obtained better service for its money." (Tr. 21.) The Government continued: "What this case is about, instead, is improper and secret self-dealing." (Tr. 22.) The Court cannot say for certain, then, that the jury did not take the Government up on its offer to convict *solely* on the basis of Post's undisclosed self-dealing and not on any effort to defraud Mount Vernon and HUD of any tangible money or property.

To be sure, it may have been *possible* for the Government to have articulated a theory of traditional money or property fraud that would have been virtually identical to the invalid honest services theory. In particular, "money or property" fraud can encompass so-called "intangible property" fraud, as opposed to "intangible *rights* fraud," the latter of which is synonymous with "honest services fraud." *See Carpenter v. United States*, 484 U.S. 19, 25, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (property's "intangible nature does not make it any less 'property' protected by the mail and wire fraud statutes"); *see also United States v. Carlo*, 507 F.3d 799, 802 (2d Cir.2007) ("The [jury instructions] properly described the harm to the victims' property interests as the deprivation of information necessary to make discretionary economic decisions."); *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.1996) ("[T]he government need not prove that the scheme successfully defrauded the intended victim."). Here, that intangible property loss could have been Mount Vernon's right to control its assets on the basis of fair and disinterested information. *See Dinome*, 86 F.3d at 283 (holding that it was a violation of §§ 1341 and 1343 to "lie[ ] in order to deprive [the victim] of control over its own assets," and noting that the "right to control theory" of money or property fraud "is predicated on a showing that some person or entity has been deprived of potentially valuable economic information"); *see also* Brette M. Tannenbaum, Note, *Reframing The Right: Using Theories of Intangible Property To Target Honest Services Fraud After* Skilling, 112 Colum. L.Rev. 359 (2012) (arguing that "intangible property" mail fraud is identical to the now-invalid "conflict-of-interest" honest services fraud except in a narrow class of classes not applicable here).

This broad theory of money or property fraud has been explicitly extended by many federal courts to circumstances where a government entity has been defrauded of its right to control its own assets based on honest and complete information. For instance, in *United States v. Maxwell*, 579 F.3d 1282 (11th Cir.2009), the defendant was convicted of mail and wire fraud as a result of a scheme to "obtain[ ] construction contracts and substantial payments from [Miami–Dade] County and the United States for which [defendant's company] was not eligible," *id.* at 1303. The Eleventh Circuit affirmed the convictions because "financial loss is not at the core of these mail and wire frauds"; rather, "[Miami–Dade] County and the United States were free to prescribe the rules of this contracting process, and the defendant was not free to dishonestly circumvent the worthy purpose of the set-aside programs." *Id.* at 1302–03; *see also United States v. Madeoy*, 912 F.2d 1486, 1492 (D.C.Cir.1990) (where defendants fraudulently obtained insurance contracts from the federal government, court affirmed the convictions for money or property fraud, explaining that a "[Federal Housing Authority] insurance commitment, by which the Government promises to pay the lender if the borrower defaults on the loan, is a 'property interest,' not an 'intangible right' under *McNally* and *Car-*

*penter*, because it involves the Government's 'control over how its money [is] spent.' " (second alteration in original)); *United States v. Telink, Inc.*, 681 F.Supp. 1454, 1454–56 (S.D.Cal.1988) (where pre-*McNally* indictment charged that defendants "knowingly and wilfully [sic] devised and intended to devise a scheme and artifice to defraud and obtain money and property and deprive governmental entities of the honest and faithful service of employees ... in connection with the sales of telecommunications equipment," evidence that went to "the right to control how one's money is spent" was admissible because that is a " 'property' right under section 1341" ([sic] in original)).[8] Thus, the actual evidence presented on a potential retrial for money or property fraud may well be quite close to the evidence presented in this trial.

But even a very broad "intangible property" theory of mail fraud cannot save the Government after *this trial*. At trial, the jury was not instructed about an "intangible property" theory of money or property fraud. For instance, in the "no ultimate harm" instruction, the jury was told that "[i]f a defendant participated in a scheme for the purpose of causing some financial or property loss to another, then no amount of honest belief on the part of the defendant that the scheme would ultimately benefit the City of Mount Vernon, its

---

8. It is worth noting that in cases of money or property fraud where the victim is a governmental entity or the citizens of a jurisdiction, Second Circuit caselaw may be narrower than these out-of-circuit cases: in *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), the Second Circuit stated that "lack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property,' " *id.* at 1217; *see also id.* ("To convict [under § 1341], the Government had to establish that the omission caused (or was intended to cause) actual

harm to the village of a pecuniary nature *or* that the village could have negotiated a better deal for itself if it had not been deceived." (emphasis in original)) While that narrow reading of "property" has been cast into doubt by the holdings in later cases like *Carlo* and *Dinome*, both of which are discussed in the main text above, perhaps that principle from *Mittelstaedt* survives in the context of mail fraud involving *governmental* entities. But the Court need not decide that issue now; it is a determination that would need to be made on retrial if the Government attempts to retry Defendants on such a theory.

citizens and/or HUD will excuse fraudulent actions or false representations by him or her." (Tr. 3766.) But "some financial or property loss to another" is most naturally read as a *tangible* property loss. It is difficult to imagine that the jury would have been contemplating the complex legal doctrine of the "intangible property" right an entity has to control its assets based on non-misleading information when it thought about what sort of "financial or property loss" Mount Vernon or HUD may have suffered.

Further, in closing, the Government stated that "the lies, the concealment of material facts, important information that these defendants engaged in.... You know, they did it to obtain money and property, money under these contracts that they weren't entitled to." (Tr. 3519.) Again, though "money under these contracts that they weren't entitled to" *could* refer to a more abstract right that Mount Vernon had to distribute its assets honestly, the most natural reading of that statement is of tangible pecuniary fraud: the Defendants took Mount Vernon's money. That is a factual proposition that the jury was not required to find to convict on honest services fraud. (*See* Tr. 3736 ("In order for you to find that there was a scheme to deprive the City of Mount Vernon and its citizens of the honest services of Constance G. Post, you need not find that actual financial harm or injury was contemplated by the scheme.... A public official owes a duty of honest, faithful, and

disinterested service to the public he or she serves and to his or her public employer.").) And, in the Indictment, the Government alleged that Post had a specific duty that was not co-extensive with money or property fraud: Post had to "disclose conflicts of interest to HUD and her employer in official matters over which she exercised, and attempted to exercise, official authority and discretion, and recuse herself where she had such conflicts of interest." (Indictment ¶ 2(c).) Though the matters in evidence over which Post exercised control all involved the Mount Vernon's distribution of money, the jury was not *required* to find that Mount Vernon was defrauded of anything to convict based on a breach of the duty described in that paragraph of the Indictment. Ultimately, then, because the Government opted to articulate two overlapping but distinct theories of fraud, it may not now say that conviction on an honest services fraud theory was the exact same as conviction on the money or property fraud theory.[9]

### *4. Prejudicial Spillover To The False Statements Conviction*

Finally, Defendant Charles argues that, if Counts One and Two are invalidated, then so must his conviction on Count Three for making false statements because "prejudicial spillover" from the invalidated counts affected the jury's verdict. This argument is unpersuasive. Charles is not entitled to a new trial on Count Three

---

**9.** Nothing in the forgoing section should be construed to hold that the Government is somehow prohibited from attempting to advance any other type of fraud theory on a potential retrial, assuming the Government complies with any necessary procedural steps. For instance, the Government may be able to charge Defendants on a bribery-or-kickback theory of honest services fraud. Indeed, charging bribery-or-kickback honest services fraud in the wake of *Skilling*-induced vacatur of honest services convictions is exactly what

the Government has done in its attempt to retry state senator Joseph Bruno. Bruno's appeal of the district court's ruling that his prosecution on a superseding indictment is not barred by the Double Jeopardy Clause or by collateral estoppel is now pending before the Second Circuit. (*See* Mem. Dec. and Order, *United States v. Bruno*, No. 09–CR–29 (N.D.N.Y. Dec. 11, 2012) (denying motion to dismiss), *appeal pending in United States v. Bruno*, No. 13–152, 2013 WL 431352 (2d Cir. Jan. 28, 2013).)

because the jury's verdict on this count was not influenced by the instructional error on the honest services count.

 The Second Circuit has "articulated a three-part test for determining whether there was likely prejudicial spillover from the evidence submitted in support of convictions that were set aside after trial." *United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir.2003). Those three considerations are:

> (1) whether the evidence introduced in support of the vacated count was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts, (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong.

*Id.* (internal quotation marks omitted). For the second factor, the rule is that spillover "is unlikely if the dismissed count and the remaining counts were either quite similar or quite dissimilar." *Id.* Put differently, " '[i]n cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover.' " *Id.* at 182–83 (quoting *United States v. Wapnick*, 60 F.3d 948, 954 (2d Cir.1995)). In sum, " '[i]t is only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts, that spillover prejudice is likely to occur.' " *Id.* at 183 (emphasis in original) (quoting *United States v. Rooney*, 37 F.3d 847, 856 (2d Cir.1994)).

 Here, Charles cannot meet this burden. The Indictment alleged that Charles made false statements in a March 20, 2006 conversation with law enforcement where Charles said that 1) his only business dealing with the City was the $500,000 loan, 2) he had no financial interest in Micros Only, and 3) he knew Micros Only was owned by two other people, Blanche and William Brown, and was a tenant in a building Charles owned. (Indictment ¶ 21.) Accordingly, as the Government notes, "[i]n order to prove these three false statements, the Government necessarily would have to unravel Charles's numerous identities and how he hid behind false and fictitious names and businesses." (Gov't Mem. 40.) This means that the large majority of evidence that was admitted for the fraud counts would have been admissible in a trial solely on the false statements count.

Charles does not appear to contest this proposition. Indeed, Defendants' combined reply brief does not address the spillover issue at all, but instead argues that a new trial should be granted on Count Three "for the reasons advanced in [the] initial moving papers." (Defs.' Reply 13.) In the opening brief, Charles states that unspecified "404(b) evidence was offered as evidence relating to the conspiracy and mail fraud counts but not the false statements counts." (Defs.' Mem. 17.) Even assuming that some of this unspecified evidence may have been inadmissible on the false statements count, to warrant a new trial on this count, the inadmissible evidence would have to have been *prejudicial:* that is, it would have to have been evidence of "such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts." *Hamilton*, 334 F.3d at 182. Charles offers no convincing explanation for how such prejudice could have occurred. The closest he gets is the argument that "the flawed honest-services fraud theory was offered as the

reason Charles made the statements," (Defs.' Mem. 17), but that proposition does not make out an argument that the evidence or argumentation was prejudicial in the relevant sense. First, it does nothing to show whether the statements themselves were true or false, or that the instruction prejudiced the jury's determination of any other necessary element of the crime. Second, Charles's argument is basically an acknowledgment that the evidence of the fraudulent scheme itself would have been admissible to the prove the false statements count. But Charles does not show how the Government's occasional framing of that evidence with the language of "honest services" was so inflammatory as to make the jury convict on the basis of prejudice rather than evidence or logic.

Charles contends that the facts here are similar to two Second Circuit cases, *United States v. Bruno*, 383 F.3d 65 (2d Cir.2004), and *United States v. Tellier*, 83 F.3d 578 (2d Cir.1996), in which the Second Circuit reversed convictions due to prejudicial spillover, but those cases are both quite different from this case. In particular, in both of those cases the defendants were charged with RICO counts that were ultimately vacated for insufficiency of evidence. *See Tellier*, 83 F.3d at 581 (defendant's "conviction for RICO and RICO conspiracy was not supported by legally sufficient evidence"); *Bruno*, 383 F.3d at 71 (reversing convictions on RICO and VCAR, Violent Crimes in Aid of Racketeering, due to legally insufficient evidence). A trial featuring RICO counts is a special case, because the Government often introduces an " 'enormous amount' " of " 'evidence of criminal activities in which a defendant did not participate to prove the enterprise element [of RICO].' " *Hamilton*, 334 F.3d at 183 (alteration in original) (quoting *Tellier*, 83 F.3d at 581, 582). Thus, in both *Bruno* and *Tellier*, "all but a 'tiny sliver of the evidence admitted on the

RICO charges' was irrelevant" to the other counts of conviction. *Id.* at 183 (quoting *Tellier*, 83 F.3d at 582); *see also Bruno*, 383 F.3d at 91 (the "false-statement conviction" reversed due to prejudicial spillover "involved a single statement 'to which all but a tiny sliver of the evidence admitted on the RICO charges [was] irrelevant.' " (quoting *Tellier*, 83 F.3d at 582)). Here, as Defendants implicitly concede, the majority of the direct evidence presented on the mail fraud counts was relevant and admissible to prove the false statements charge. Indeed, the evidence in any retrial on the false statements count would look nearly identical to the evidence presented in this trial—it is likely that only the jury instructions and the Government's framing of the fraud that would differ. But Charles cannot show that the incorrect jury instructions themselves prejudiced the jury when it was considering the false statements count, especially because the jury was instructed to consider each Defendant individually and each count separately. (Tr. 3746 ("The Indictment contains three separate counts, each of which must be considered separately.").)

The overwhelming majority of courts have also rejected prejudicial spillover arguments to other counts of conviction in cases where courts have vacated certain counts of honest services fraud in the wake of *Skilling*. *See Hornsby*, 666 F.3d at 311–12 (no spillover to counts of conviction for tampering with evidence and obstruction of justice); *Black*, 625 F.3d at 390 (no spillover to counts of conviction for obstruction of justice because "the theory of honest-services fraud submitted to the jury was esoteric rather than inflammatory; the evidence of such fraud was a subset of the evidence of pecuniary fraud; and the evidence of obstruction of justice was very strong"); *Riley*, 621 F.3d at 324–28 (no spillover to counts of conviction for traditional mail fraud and misapplication of

public property); *Martignoni*, 2011 WL 4834217 at *11 (no spillover to counts of conviction for making false entries in bank records; most of the evidence presented at the combined trial would have been admissible to prove the bank fraud counts and "any evidence that might have been inadmissible had Martignoni been charged only with [bank fraud] was not 'prejudicial' in the sense that it would 'have tended to incite or arouse the jury into convicting the defendant on the remaining counts'" (quoting *United States v. Vebeliunas*, 76 F.3d 1283, 1294 (2d Cir.1996))). *But see Wright*, 665 F.3d at 575 (vacating counts of conviction for traditional mail fraud due to prejudicial spillover where "much of the evidence at this trial [for honest services fraud and traditional mail fraud] would be inadmissible at a hypothetical trial on traditional mail fraud alone"). The rationale in these cases applies here; therefore the false statements conviction stands.

### III. Conclusion

For the reasons stated herein, Defendants' motion is granted as to Counts One and Two and denied as to Count Three. The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 50).

SO ORDERED.